UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

THE SANDS HARBOR MARINA CORP, SANDS )    09-cv-3855 (JS)(MJW)
HARBOR MARINA LLC, THE SANDS HARBOR )
MARINA OPERATING CORP, SANDS MARINA )
OPERATING LLC )
              Plaintiffs, )    **THIRD-PARTY**
)    **COMPLAINT**
)
    - v - )    **Third-Party Plaintiff**
)    **Demands**
)    **a Jury**
WELLS FARGO INSURANCE SERVICES OF OREGON, )
INC., )
)
             Defendant. )
------------------------------------------------------------------ X
WELLS FARGO INSURANCE SERVICES OF OREGON, )
INC., )
             Third-Party Plaintiff, )
)
)
    - v - )
)
EVMC REAL ESTATE CONSULTANTS, INC., DAVID P. )
GUILOT, AIDA ESACOVE, LARRY ESACOVE and )
ANTHONY B. CHOPRA, )
)
)
             Third-Party Defendant. )
------------------------------------------------------------------ X

Defendant/Third-Party plaintiff WELLS FARGO INSURANCE SERVICES OF OREGON,

INC. ("Wells Fargo") by its attorneys, LEWIS BRISBOIS BISGAARD & SMITH LLP,

complaining of the third-party defendants EVMC REAL ESTATE CONSULTANTS, INC., DAVID

P. GUILOT, AIDA ESACOVE, LARRY ESACOVE, and ANTHONY B. CHOPRA (collectively,

"Third-Party Defendants"), alleges as follows:

**PARTIES**

1.     Third-Party Plaintiff Wells Fargo is an Oregon corporation with a principal place of

business at 3501 Fairview Industrial Dr. SE, Salem, Oregon, 97302.

2.      Upon information and belief, Third-Party Defendant EVMC REAL ESTATE CONSULTANTS, INC. ("EVMC") is a California corporation, with its principle place of business in Los Angeles County, California.

3.      Upon information and belief, Third-Party Defendant DAVID P. GUILOT ("Guilot") is Vice President of   EVMC.

4.      Upon information and belief, Third-Party Defendant AIDA ESACOVE ("Aida") is an officer and principal of EVMC and resides in Los Angeles County, California.

5.      Upon information and belief, Third-Party Defendant LARRY ESACOVE ("Larry") is an officer and principal of EVMC and resides in Los Angeles County, California.

6.      Upon information and belief, Third-Party Defendant ANTHONY B. CHOPRA ("Chopra") is the former President of EVMC and resides in Los Angeles County, California.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

8.      Venue is proper in this district pursuant to 28 U.S.C. 1391 (a) because substantial parts of the events or omissions giving rise to the third-party complaint occurred in New York.

9.      In addition, pursuant to 28 U.S.C. § 1367, jurisdiction of this Court over this third-party action and venue are supplemental to the jurisdiction and venue of the Court over the claims alleged in Plaintiff's Complaint.

10.     This Court has personal jurisdiction over Third-Party Defendants pursuant to NY CPLR § 302, because Third-Party Defendants have transacted business within the state of New York, contracted to supply goods or services in the state of New York, and/or committed tortious

acts without the state of New York causing injury to person or property within the state of New York.

11.    On or about August 31, 2009, plaintiffs The Sands Harbor Marina Corp., Sands Harbor Marina LLC, The Sands Harbor Marina Operating Corp., and Sands Marina Operating LLC (collectively, "Sands Harbor" or "Plaintiffs") filed a Complaint against Defendant/Third-Party Plaintiff, a copy of which is attached hereto as Exhibit A (the "Complaint").

### FACTS

12.    In or about 2006, Wells Fargo was retained by EVMC to provide EVMC insurance brokerage services, including assistance in procuring Residual Value Insurance for properties in connection with financing to be obtained for the purchase and/or development of such properties.

13.    Upon information and belief, Sands Harbor attempted to obtain $225 million in acquisition and construction financing through EVMC (the "Loan" or "Loan Transaction") in connection with a planned Florida real estate development project (the "Project"). Upon information and belief, Sands Harbor required the financing to close on a contract to purchase and develop a parcel of real property in Pompano Beach, Florida (the "Property").

14.    In the Complaint filed by Sands Harbor herein, it is alleged that a number of representations were made by Guilot to Sands Harbor's representatives at a meeting held on October 5, 2006, including representations that:

(a) EVMC would close the loan with Sands Harbor within 45 days of Sands Harbor's payment of $1,022,000.00 (representing 1% of the loan amount, first phase) to EVMC's legal counsel, Tisdale & Nicholson ("T&N").

(b) Aida Esacove (one of EVMC's principals) was "a genius" who owned a certain

proprietary financing model and there was a "100 percent certainty that EVMC would close the Loan Transaction" as long as such project was approved by Wells Fargo.

(c)  The loan would be for 100% of the acquisition, closing and development costs of the Project at a rate equal to L.I.B.O.R. plus 25 basis points, and that this was made possible by "Aida's proprietary financing scheme."

(d)  Despite the uncertainty surrounding any real estate investment, there was a "100% certainty of the project being approved [by EVMC], as preliminary approvals have already been granted by the insurer underwriting the project" and that "[Mr. Guilot] wouldn't even be here at this stage unless EVMC was committed to the Loan Transaction."

(e)  "[T]he only way the loan would not be approved was if there was a material misrepresentation in your appraisal."

(f)  EVMC would approve and fund any project as long as it was approved by the insurance underwriter, and, according to Guilot, the input and approval from Wells Fargo was the keystone around which Aida's proprietary financing model was built, as Wells Fargo was responsible for ensuring the viability of the Project and providing both the underwriting expertise and residual value insurance that EVMC required before it would commit to the Project.  In regards to this alleged representation, it is alleged that Guilot particularly emphasized that Wells Fargo's participation in EVMC/Aida Esacove's proprietary financing model lent it unquestionable credibility and that the involvement of Wells Fargo should convince Sands Harbor that EVMC did in fact have the ability to provide the financing as set forth on the Indicative Term Sheet.

15.   Sands Harbor further alleges that during the course of the October 5, 2006 meeting, "Guilot explained that, in addition to meeting with Sands Harbor, he had come to New York to deposit Tennessee Valley Authority Bonds totaling $1 Billion into the Bank of America.  Guilot

represented that Aida Esacove owned these bonds, and they would be used as collateral for the loan to Sands Harbor.  He even pulled a stack of papers from his briefcase, which he identified as the TVA bonds."

16.    Thereafter, following entry into a contract with EVMC, Sands Harbor alleges it wired $1,022,000 into a trust account for the benefit of EVMC.

17.    Further to its efforts to obtain residual value insurance for the Project, Wells Fargo thereupon submitted the Sands Harbor Project package to Insurative, a London based insurance broker and received an "indication" dated October 19, 2006 providing basic proposed terms of residual value insurance to be made available subject to provision of information and/or documentation to the insurer as might be requested, including confirmation of the full transaction details from the bank, the appraisal value of the Property to be used as collateral, and a signed and dated application form.

18.    Although funding appeared to have been secured from NatCity Investments, Inc. ("NatCity"), and it is alleged by Sands Harbor that EVMC provided Sands Harbor with a "memorandum of lending" confirming a loan in the amount of $100,022,100.00, Sands Harbor alleges that the loan did not close within 45 days of EVMC's receipt of the $1,002,000.00, payment, and, in fact, Sands Harbor alleges that NatCity became concerned with some irregularities concerning EVMC, Aida Esacove and Guilot, and pulled out of the transaction.

19.    Sands Harbor alleges that, upon information and belief, "NatCity backed out of the transaction with EVMC and Wells Fargo because NatCity discovered, through its background checks on Aida Esacove, EVMC, David Guilot and others, that the Loan was a scheme to defraud and that Aida Esacove was orchestrating a massive financial scam with the assistance of Guilot."

20.    Despite the fact that NatCity backed out of the transaction, Sands Harbor alleges that EVMC convinced Sands Harbor to remain committed to obtaining funding for the transaction through EVMC, with EVMC representing in January 2007 that "[d]raft loan documents are being prepared" utilizing an alternate source of funding for the loan.  And in March 2007 Sands Harbor alleges that EVMC had its lawyers send Sands Harbor a package which "Guilot and Aida Esacove represented to be the closing documents for the loan."

21.    Its representations regarding the Loan notwithstanding, Sands Harbor alleges that the Loan didn't close, and Guilot and Aida Esacove explained away delays in the actual closing of the Loan by first claiming "funds for the Loan Transaction were still curing," and then that even after the funds cured and the residual value insurance for the transaction was in place, the counterparty banks to the Loan Transaction demanded a ten day window in which to use the funds to trade international currencies and make a profit.

22.    As the seller of the Property allegedly became uneasy about the continuing delays, Sands Harbor alleges that Guilot took a number of steps to convince the seller that the loan was legitimate, including inviting the seller to fly to Pittsburgh to verify the availability of funds and, while he was there, "produc[ing] books and records purporting to show hundred of millions of dollars in EVMC counterparty accounts and personally assur[ing] the seller that 'the money for the Loan Transaction was in place' and that EVMC was just waiting for some incidental paperwork to be completed."

23.    When "continued inexplicable delays by EVMC" prevented the Loan Transaction from closing, Sands Harbor alleges it was convinced to continue with the transaction upon receiving advice from Wells Fargo in May 2007 that Wells Fargo had received bank confirmation of blocked/reserved funds set aside for the Project in the amount of $105,000,000 and thereafter Guilot

in June 2007 provided Sands Harbor with a SWIFT transfer credit advice document purporting to indicate that EVMC was the beneficiary of $500,000,000 from an oversees Citibank depositor.

24.     Sands Harbor alleges that Guilot followed this correspondence with a letter stating that EVMC's group had been working around the clock to conclude the deal points of the transaction, and in August EVMC provided Sands Harbor with a letter indicating that "EVMC has a reserved blocked funds OPEC Facility" and that the 'sum of $1,022,000 has been earmarked for the [SANDS HARBOR] Project."   Additionally, Sands Harbor alleges that EVMC transmitted a fraudulent letter purporting to be from the OPEC Fund for International Development indicating that "the allocated project amount has been approved" for Sands Harbor, and that the transfer of the funds "will commence from week of September 17 on, to the EVMC master escrow account held at National Real Estate Information Services."   Sands Harbor alleges that it later learned that "The OPEC Fund" was on an international watch list for fraudulent entities.

25.     This representation was allegedly followed by a telephone call from Wells Fargo advising that it had received word from EVMC that the Loan closing would be imminent, and that EVMC was finalizing a $500,000,000 bond offering which would provide the funds for the project. And EVMC alleges that while Guilot was "evasive" when they called to confirm, he indicated that Sands Harbor could rely on what Wells Fargo had represented.

26.     In alleged reliance on these representations, Sands Harbor alleges it paid $100,000 to the Seller to secure an extension to perform under its real estate contract with the Seller, and it made payments totaling some $1.8 million to architects, engineers, attorneys and other professionals involved with the Project.

27.     Notwithstanding the various representations it alleged it relies upon, Sands Harbor alleges that the Loan Transaction did not close by the end of January 2008, the end of its extended

deadline for closing on the purchase of the Property. Sands Harbor alleges that while EVMC's counsel represented in early January 2008 that "there should be no problem closing the loan by January 31, 2008", EVMC's counsel subsequently emailed to Sands Harbor's counsel a list of conditions precedent needed to be completed prior to closing of the Loan Transaction which had never been discussed in the entire prior 16-month history of the transaction and which list "included conditions that were impossible for any borrower seeking financing for an acquisition and development project to satisfy". Accordingly, Sands Harbor alleges it was compelled not to proceed with the acquisition/development.

28.    Sands Harbor alleges that the Loan Transaction, despite all of the representations that were made, was actually just "EVMC's and Aida Esacove's latest scam" "conceived . . . as a conduit to defraud SANDS HARBOR (and others like it) out of money", and that, in fact, "neither EVMC nor Aida Esacove was licensed to provide the services contemplated under the Loan", neither of them, in fact actually ever "closed a loan", "the SWIFT Transfer and OPEC letter were forgeries administered and passed along by Guilot, Aida Esacove and EVMC," and "EVMC was nothing more than a shell corporation which Aida Esacove used as her alter ego for the purpose of defrauding potential investors in one of her many financial scams."

29.    Based upon these allegations, Sands Harbor asserts claims against Wells Fargo for fraud, negligent misrepresentation, common law negligence, breach of fiduciary duty and unjust enrichment, and claims it has incurred damages " in at least the sum of $6,472,000, representing the $1,022,000 payment it made by EVMC, the $3,050,000 downpayment it made to the seller, the $600,000 in subsequent fees it paid [to the] seller to extend the contract and the $1,800,000 it paid to vendors and consultants for the Project such as architects, engineers and lawyers." Sands Harbor also claims entitlement to punitive damages in the sum of at least $10 million.

## COUNT I

## <u>FRAUD</u>

30.     Defendant/Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "29" of this Third-Party Complaint as if more fully set forth herein.

31.     In the course of Wells Fargo's efforts to place residual value insurance as part of the contemplated Loan Transaction, Wells Fargo relied upon Third-Party Defendants' actions and representations.

32.     Among other things, Wells Fargo relied upon the following representations:

(a) that the Loan Transaction was a valid commercial transaction for the purpose of providing actual, legitimate financing for Sands Harbor to complete the acquisition and development of the Property;

(b) that EVMC was a legitimate business and its principals were legitimate business people, acting with an intent to obtain real financing for the Project;

(c) that EVMC was not merely a shell corporation which Aida Esacove used as her alter ego for the purpose of defrauding potential investors in financial scams;

(d) that EVMC and Aida Esacove were legally authorized to make, broker, arrange or provide financing, and held any necessary licensing for the purposes of doing so;

(e) that the representations EVMC and its agents and representatives were making to Sands Harbor and Wells Fargo in connection with the Loan Transaction - - including, among other things: that EVMC had the capacity to either lend Sands Harbor the money needed for the Project or consult with counterparty financial institutions to arrange financing; that the first part of the financing for the Project (in the amount of $100,022,000) would be provided within 45 days of Sands Harbor's payment of $1,022,000; that Aida Esacove owned $1 billion in Tennessee Valley Authority

Bonds that would be used as collateral for the loan to Sands Harbor; that funds had been blocked/reserved for financing of the Project in an amount in excess of $100,000,000 in or about March 2007; that again, in May 2007, funds had been blocked/reserved and set aside for the Project in the amount of $105,000,000 and EVMC was preparing final loan documents for an anticipated closing during the first week of June 2007; that EVMC was the beneficiary of $500,000,000 from an overseas Citibank depositor in or about June 2007, and EVMC and its counterparties would be working around the clock to finalize the Loan Transaction before the end of July 2007; that in or about August 2007 EVMC had a reserved blocked funds OPEC facility from which $100,022,000 had been earmarked for the Project; that in October 2007 EVMC was finalizing a $500,000,000 bond offering, and this vehicle would finally provide the funds for Sands Harbor; and that there should be no problem finally closing the loan by January 31, 2008 - - were all truthful statements, not intended to deceive or mislead the parties to the Loan Transaction and the related efforts to place residual value insurance; and

(f) that the SWIFT transfer and OPEC letter were valid documents, and not forgeries.

33.    Upon information and belief, based upon the allegations made by Sands Harbor in its Complaint herein, these representations were false and, in fact, intended to mislead the parties regarding the true status of efforts to fund the proposed Loan Transaction.

34.    Upon information and belief, based upon the allegations made by Sands Harbor in the Complaint, the above representations were made with knowledge of their falsity, with intent to induce reliance thereon.

35.    These representations were material, in that they went to the heart of the parties' efforts to complete the various aspects of the Loan Transaction, and the related placement of residual value insurance for the Project.

36.    Wells Fargo relied upon these representations to its detriment, continuing to invest time and effort into attempting to place residual value insurance for the Loan Transaction, and

communicate with Sands Harbor regarding the status of EVMC's efforts to put funding in place for the Loan Transaction as per Third Party Defendants' representations.

37.     As a result of Third Party Defendants' allegedly material misrepresentations and/or omissions, Wells Fargo has been made the subject of the Complaint herein, compelled to incur substantial fees and costs to defend against the claims made against it by Sands Harbor, and exposed to potential liability in excess of $16 million. Wells Fargo also expended substantial time pursuing efforts to place residual value insurance for the Loan Transaction, for which it ultimately received no compensation. Additionally, Wells Fargo damaged its reputation in the London market, in particular with Insurative, which, at Wells Fargo's request, also invested substantial time into attempting to place residual value insurance for the Project, and also received no compensation for its efforts.

## COUNT II

## CONTRIBUTION

38.     Defendant/Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "37" of this Third-Party Complaint as if more fully set forth herein.

39.     Wells Fargo's actions undertaken in the course of its efforts to provide residual value insurance for the Project were at all times undertaken in reliance upon the belief that EVMC was acting in good faith, in a bona fide effort to provide financing for the Project.

40.     Any injuries, damages or losses that may be found to have been suffered by Sands Harbor as a result of alleged negligence, negligent misrepresentations or breach of fiduciary duty by Wells Fargo will have been caused or contributed to, in whole or in part, by Third-Party Defendants.

41.     To the extent that Wells Fargo is held to be liable to Sands Harbor for any of Sands Harbor's alleged injuries, damages or losses suffered as a result of the conduct alleged in the

Complaint, then, pursuant to New York Civil Practice Law and Rules § 1401, Wells Fargo is entitled to recover as against Third Party Defendants in contribution in an amount equal to their equitable share apportioned according to fault of any recovery granted to Sands Harbor as a result of their culpable conduct.

**COUNT III**

**INDEMNIFICATION**

42.     Defendant/Third-Party Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "41" of this Third-Party Complaint as if more fully set forth herein.

43.     Any liability Wells Fargo may incur to Sands Harbor herein will be based entirely on the conduct of Third-Party Defendants with regard to the Loan Transaction.

44.     To the extent that Wells Fargo is held to be liable to Sands Harbor for any of Sands Harbor's injuries, damages or losses allegedly suffered as a result of the conduct complained of in the Complaint, Wells Fargo is entitled to common law indemnification by Third-Party Defendants for the full amount of any award that may be rendered as against Wells Fargo.

**WHEREFORE**, the Defendant/Third-Party Plaintiff demands judgment against the Third-Party Defendants for indemnity for the full amount of any recovery by Plaintiffs against Third-Party Plaintiff and/or apportionment of liability and contribution for any recovery Plaintiff obtains against Defendant/Third-Party Plaintiff, damages for fraud to the extent fraud is proven, punitive damages due to any such fraud, together with an award of Defendant/Third-Party Plaintiff's reasonable attorneys fees and the costs and disbursements of this action.

Dated: New York, New York
May 27, 2010

Respectfully submitted,

_Peter J. Biging (PJB 9913)_
Jura C. Zibas (JZ 8970)
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
199 Water Street, 25th Floor
New York, New York 10038
Tel.: (212) 232-1300

*Attorneys for Defendant/Third-Party Plaintiff*

TO:   Roy A. Klein, Esq.
      *Attorney for Plaintiff*
      532 Broad Hollow Road #144
      Melville, NY 11747
      (631) 777-1313

EXHIBIT A

UNITED STATES DISTRICT COURT **CV - 09 3855**

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

EASTERN DISTRICT OF NEW YORK

————————————————————x

THE SANDS HARBOR MARINA CORP.
SANDS HARBOR MARINA LLC
THE SANDS HARBOR MARINA OPERATING CORP.
SANDS MARINA OPERATING LLC.

(S)

★      SEP 0 4 2009      ★

LONG ISLAND OFFICE

Plaintiff,

No. 09 CV _____

-against-

**COMPLAINT**   SEYBERT, J.

WELLS FARGO INSURANCE
SERVICES OF OREGON, INC.

WALL, M.J.

Defendant.

————————————————————x

Plaintiff, The Sands Harbor Marina Corp., Sands Harbor Marina LLC, The Sands Harbor

Marina Operating Corp and Sands Harbor Marina LLC. (collectively "SANDS HARBOR"),

through its attorney, Roy A. Klein, for its complaint against defendant Wells Fargo Insurance

Services of Oregon, Inc. f/k/a Accordia ("Wells Fargo"), hereby alleges as follows:

### Nature of the Action

1.      SANDS HARBOR brings this action to recover nearly $7 million in out-of-

pocket damages, additional incidental and consequential damages for lost profits and loss of

reputation in an amount to be determined at trial, and punitive damages it suffered as a result of

its reasonable reliance on Wells Fargo's repeated written representations, promises and

assurances that its client, EVMC Real Estate Consulting Services, Inc. ("EVMC"), would furnish

SANDS HARBOR with the $225,000,000.00 in acquisition and construction financing (the

"Loan") necessary for SANDS HARBOR to close on its contract to purchase and develop a

parcel of real property in Pompano Beach, Florida (the "Project").

2.      Based on Wells Fargo's repeated representations, promises and assurances,

1

SANDS HARBOR: (a) paid EVMC consideration of $1,022,000.00; (b) made payments totaling $600,000.00 to the seller of the real property to obtain extensions of the contract to purchase the property pending receipt of the financing from EVMC; (c) paid some $1,800,000 to vendors and consultants for the Project, including architects, engineers and lawyers; and (d) forewent making alternate financing arrangements for the Project, which ultimately caused SANDS HARBOR to forfeit its $3,050,000 down payment for the property when EVMC failed and refused to provide SANDS HARBOR with the financing.

3.      Indeed, just days before the extended expiration date of SANDS HARBOR's contract with the seller, EVMC suddenly imposed unreasonable conditions precedent to the sale that  EVMC knew or should have known no borrower could have satisfied including, for example, that SANDS HARBOR provide a building permit for the Project even though SANDS HARBOR obviously could not have even applied for such a permit because it had not yet acquired the property.

4.      Upon information and belief, EVMC and its responsible parties waited 16 months to impose these eleventh-hour conditions as part of a pre-conceived plan to commit a massive financial scam, and the conditions were nothing more than EVMC's pre-planned exit strategy for its fraudulent scheme.

5.      SANDS HARBOR seeks judgment against Wells Fargo, under the theories of fraud, negligent misrepresentation, common law negligence and breach of fiduciary duty.

**Parties**

6.      SANDS HARBOR is a corporation duly organized under the laws of the State of New York, with its principal place of business in this District. SANDS HARBOR is in the business of property acquisition and development.

2

7.     On information and belief, Wells Fargo is a foreign business corporation authorized to do business in New York. On information and belief, Wells Fargo is in the business, *inter alia,* of providing insurance and risk management services to commercial real estate lenders and those in the commercial real estate business.

### Jurisdiction and Venue

8.     The Court has jurisdiction over this pursuant to 28 U.S.C. $\S$ 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.     Venue is proper in this district pursuant to 28 U.S.C. 1391(a) because substantial parts of the events or omissions giving rise to the action occurred here. Among other things, the seven letters from Wells Fargo setting forth the representations giving rise to SANDS HARBOR claims were addressed to, delivered to and received by SANDS HARBOR in this District.

### Factual Background

#### *The Acquisition/ Development Project*

10.     On August 20, 2005 SANDS HARBOR entered into a contract to purchase and develop a parcel of real property in Pompano Beach, Florida (the "Project").   The closing was to take place after a certain period of due diligence performed by SANDS HARBOR.

11.     In its search for financing for the Project, SANDS HARBOR was introduced to EVMC.  In courting SANDS HARBOR, EVMC touted its "lending capability" and "consulting business" as advantages to working with it in arranging multi-million dollar commercial financing.  Specifically, EVMC represented that it could either lend SANDS HARBOR the money needed to acquire and develop the Project or consult with counterparty financial institutions to arrange the financing, or a combination of both.  One of the counterparty

3

institutions that EVMC represented it had an ongoing relationship with was Wells Fargo, which

EVMC indicated would play an integral part in the loan transaction.

12.     On the strength of these representations, SANDS HARBOR began working with

EVMC.  SANDS HARBOR and EVMC thereafter jointly determined that SANDS HARBOR

would need a loan of approximately $225,258,880 to finance the acquisition and development of

the Project.  The financing was to be provided in two phases, the first of which was to be for

approximately $100,022,000.  Again EVMC represented that it would provide assistance to

SANDS HARBOR in "structuring" the financing and would provide SANDS HARBOR with

access to its financial counterparties .

13.     On October 3, 2006, EVMC provided SANDS HARBOR with an "Indicative

Term Sheet", which outlined EVMC's preliminary lending terms and a "Format of Structuring"

that indicated the first step in "Aida's proprietary financing model" was "submitting the project

to EVMC's risk management and underwriting group (Wells Fargo) for risk analysis/due

diligence."  In other words, EVMC represented to SANDS HARBOR that it wouldn't even get to

first base with SANDS HARBOR until Wells Fargo got involved in, and approved, the Project.

A copy of the "Format of Structuring" is annexed hereto as Exhibit A.

*The Agreement Between SANDS HARBOR and EVMC and Wells Fargo's Initial Representations*

14.     On October 5, 2006, representatives of SANDS HARBOR met with David Guilot

("Guilot") in New York, who held himself out as "Vice President" of EVMC, to further discuss

EVMC's proposal for structuring the financing of the Project.

15.     During the course of the meeting, Guilot stated the following:

4

(a) EVMC would close the loan with SANDS HARBOR within 45 days of SANDS HARBOR's payment of $1,022,000.00 (representing 1% of the loan amount, first phase) to EVMC's legal counsel, Tisdale & Nicholson ("T&N").

(b) Aida Esacove (one of EVMC's principals) was "a genius" who owned a certain proprietary financing model and there was a "100 percent certainty that EVMC would close the Loan Transaction" as long as such project was approved by Wells Fargo.

(c) The loan would be for 100% of the acquisition, closing and development costs of the Project at a rate equal to L.I.B.O.R. plus 25 basis points, and that this was made possible by "Aida's proprietary financing scheme."

(d) Despite the uncertainty surrounding any real estate investment, there was a "100% certainty of the project being approved [by EVMC], as preliminary approvals have already been granted by the insurer underwriting the project" and that "[Mr. Guilot] wouldn't even be here at this stage unless EVMC was committed to the Loan Transaction."

(e) "[T]he only way the loan would not be approved was if there was a material misrepresentation in your appraisal."

(f) EVMC would approve and fund any project as long as it was approved by the insurance underwriter. According to Guilot, the input and approval from Wells Fargo was the keystone around which Aida's proprietary financing model was built, as Wells Fargo was responsible for ensuring the viability of the Project and providing both the underwriting expertise and residual value insurance that EVMC required before it would commit to the Project. Guilot particularly emphasized that Wells Fargo's participation in EVMC/Aida Esacove's proprietary financing model lent it unquestionable credibility and that the involvement of Wells Fargo

5

should convince SANDS HARBOR that EVMC did in fact have the ability to provide the
financing as set forth on the Indicative Term Sheet.

16.     As further proof of EVMC's capabilities and of Wells Fargo's involvement in the
Loan, Guilot represented to SANDS HARBOR that SANDS HARBOR would begin receiving
updates directly from Wells Fargo "within days" of formally engaging EVMC.

17.     Also during the course of the meeting, Guilot explained that, in addition to
meeting with SANDS HARBOR, he had come to New York to deposit Tennessee Valley
Authority Bonds totaling $1 Billion into the Bank of America.  Guilot represented that Aida
Esacove owned these bonds, and they would be used as collateral for the loan to SANDS
HARBOR.  He even pulled a stack of papers from his briefcase, which he identified as the TVA
bonds.

18.     After the meeting in New York with Guilot, SANDS HARBOR had its counsel
communicate with T&N to confirm the representations made by Guilot and Aida Esacove
regarding EVMC's capabilities and the involvement of Wells Fargo.  T&N confirmed that
EVMC and Aida Esacove and Larry Esacove maintained a long-standing relationship with Wells
Fargo and that Wells Fargo was an integral counterparty to the Loan.  T&N confirmed Guilot's
initial representations, to wit: EVMC maintained complimentary and counterparty relationships
with many national and international financial institutions, including Wells Fargo, and that Wells
Fargo would be an integral part of the transaction.  The involvement and relationship between
Wells Fargo and EVMC provided SANDS HARBOR with the assurance it needed to proceed
with EVMC.

19.    EVMC thereafter forwarded a formal agreement to SANDS HARBOR.  Based

upon this, on or about October 9, 2006, SANDS HARBOR, through its Florida counsel, Ruden

& McCloskey, wired the sum of $1,022,000.00 into T&N's Attorney Trust Account.

20.    As represented by Guilot, Wells Fargo confirmed EVMC's and T&N's initial

representations about Wells Fargo's involvement in the Loan Transaction by contacting SANDS

HARBOR "within days" of SANDS HARBOR wiring the money to EVMC.  By letter dated

October 13, 2006 (Exhibit B), addressed, sent and delivered to SANDS HARBOR at its office in

West Islip, New York, Wells Fargo advised SANDS HARBOR that:

> This letter is to inform [SANDS HARBOR] that we have submitted your project
> package to our London insurance partners on behalf of our client EVMC Real
> Estate Inc. for the purpose of structuring a Residual Value Insurance policy
> around the real estate development project.
>
> EVMC has required this enhancement as part of their project finance structure.
> We will provide a formal quote to EVMC subject to all the due diligence and
> project funding commitments being met.

21.    Furthermore, by letter dated October 20, 2006 (Exhibit C), and addressed, sent

and delivered to SANDS HARBOR at its office in West Islip, New York, Wells Fargo advised

SANDS HARBOR that:

> This letter is to inform you that we are processing your project package with our
> London based insurance company on behalf of our client EVMC Real Estate Inc.
> for the purpose of structuring a Residual Value Insurance policy around the real
> estate development project.
>
> The insurance company has confirmed that the Sand Harbor development project
> will be insured as part of EVMC's financing structure.
>
> We will forward an indicative quote sheet the first part of next week for your
> reference.

22.    Wells Fargo continued to play an integral part in the transaction by taking the lead

in conveying information from EVMC to SANDS HARBOR.  By letter dated October 25, 2006

(Exhibit D), and addressed, sent and delivered to SANDS HARBOR at its office in West Islip, New York, Wells Fargo provided the "formal quote to EVMC" referenced in its October 13, 2006 letter and further advised SANDS HARBOR that:

> we have confirmed that the Sand Harbor project will be insured through our London insurer. I have attached the master EVMC term sheet of coverage.

23.     A copy of an October 19, 2006 quote sheet from Insurative was attached to this letter, which set forth the parameters for issuance of the Residual Value Insurance to SANDS HARBOR in favor of EVMC.

24.     By letter dated December 4, 2006 (Exhibit E), and addressed, sent and delivered to NatCity Investments, Wells Fargo advised that it was committed to "providing an insurance binder for Residual Value insurance on the Sand Harbor LLC project to be effective once the engagement contract is signed by [NatCity]." Wells Fargo further represented that it "look[s] forward to mutually closing this transaction for Sand Harbor LLC."

25.     Two days later, by letter dated December 6, 2006 (Exhibit F), and addressed, sent and delivered to SANDS HARBOR at its office in West Islip, New York, Wells Fargo advised SANDS HARBOR that it had received the "engagement contract" from NatCity referenced in Wells Fargo's December 4, 2006 letter, to wit:

> This letter is to confirm receipt of the executed commitment to EVMC by NatCity representing the bank responsible for funding the Sand Harbor LLC project in the amount of $100,022,100 USD
>
> We will be coordinating the insurance which is structured around the transaction with NatCity shortly.

26.     Wells Fargo's continued, repeated representations as set forth above– which SANDS HARBOR reasonably relied upon – gave SANDS HARBOR reason to believe that EVMC was a legitimate lender with the capability of providing financing for the Project and that

Aida Esacove and Guilot were reputable business persons.

    27.    On December 21, 2006, EVMC provided SANDS HARBOR with a memorandum

of lending (Exhibit G) which purposed to expound on the Indicative Term Sheet.  In it, EVMC

confirmed that:

> The Loan Amount will be $100,022,100.00. . .loan advances will be made in
> accordance with a cash flow schedule approved by EVMC and Wells Fargo on
> behalf of the residual value insurer for the Project.

    28.    Furthermore, under "conditions precedent", EVMC represented that:

> The extension of the loan is subject to. . .a final budget approved by EVMC,
> Wells Fargo and the residual insurance company and. . . a final cash flow
> schedule for the Project approved by EVMC, Wells Fargo and the surety
> guarantor.

    29.    Throughout this time period, in addition to the letters set forth above, SANDS

HARBOR continued to receive emails from Wells Fargo assuring SANDS HARBOR that the

Loan was working toward conclusion and that EVMC was a legitimate entity.

    30.    These representations further confirmed that Wells Fargo was an integral and

responsible party to the Loan.

### *EVMC's Continued Representations, Promises and Assurances*

    31.    Despite the foregoing representations of EVMC and Wells Fargo, the loan did not

close within 45 days of EVMC's receipt of the $1,022,000.00, although SANDS HARBOR

continued to receive updates from Wells Fargo assuring SANDS HARBOR that EVMC was

progressing in finalizing the loan transaction and that Loan Transaction was a *fait accompli*.

SANDS HARBOR continued to rely upon these updates from Wells Fargo as evidence that

EVMC was acting in good faith and that EVMC was capable of providing the financing.  As a

result of these representations, SANDS HARBOR did not entertain other financing leads for the

Project.

9

32.     Upon information and belief, in or about January 2007, NatCity became concerned with some irregularities concerning EVMC, Aida Esacove, and Guilot and pulled out of the transaction with EVMC and Wells Fargo.  NatCity had no direct contact with SANDS HARBOR and therefore did not disclose to SANDS HARBOR that it was pulling out of the Loan (SANDS HARBOR did not learn about NatCity pulling out until later, as set forth below) or its reason for refusing to participate in EVMC/Aida Esacove's "proprietary lending model".

33.     Upon information and belief, NatCity backed out of the transaction with EVMC and Wells Fargo because NatCity discovered, through its background checks on Aida Esacove, EVMC, David Guilot and others, that the Loan was a scheme to defraud and that Aida Esacove was orchestrating a massive financial scam with the assistance of Guilot.  Upon information and belief, Wells Fargo also became aware of this information when advised by NatCity that it was backing out of the Loan, but Wells Fargo continued to lend its good name and reputation to EVMC and the Loan and continued to advise SANDS HARBOR that the Loan would close.

34.     SANDS HARBOR did not become aware of NatCity's decision to not participate until SANDS HARBOR began to question the delays in the Loan closing.  Guilot indicated that EVMC had to search for more counterparty banks as the transaction was "becoming too big for NatCity."  Guilot assured SANDS HARBOR that there was no reason to be concerned, because Aida Esacove would tap her financial contacts and make arrangements for another institution to take NatCity's place.  Guilot also pointed to Wells Fargo's continued involvement as evidence that the Loan would be closing soon.

35.     Despite the fact that NatCity backed out of the Loan Transaction, Wells Fargo remained committed to EVMC and the Loan Transaction, which provided SANDS HARBOR with assurance regarding Guilot's comments regarding the Loan closing.

10

36.     By letter dated January 22, 2007, EVMC advised SANDS HARBOR that

> this is to confirm what was discussed with you recently regarding your loan.
> Draft loan documents are being prepared at this time and are approximately 80%
> ready for distribution. However, we are and have been working with the funders
> for these large loans to finalize agreements with them for the funding of your
> specific project.
>
> This effort is not yet completed as each project has to go through several layers of
> review and it involves many parties and as such, it takes time. Once we finalize
> this process and have approval of the amounts and individualized terms and
> conditions on the funding side.

37.     In or about March , 2007, SANDS HARBOR became concerned and began to press

EVMC for performance. By letter dated March 21, 2007, T&N sent SANDS HARBOR a

package that T&N, Guilot and Aida Esacove represented to be the closing documents for the

loan, identifying EVMC as "lender" and SANDS HARBOR as "borrower". Although the

promissory note was not included, T&N represented that it would be forthcoming within the

"next few days." When asked by SANDS HARBOR why the promissory note wasn't included

along with the other closing documents, Guilot explained that "funds for the Loan Transaction

were still curing" and that one of EVMC's counterparty financial institutions would provide

evidence of this. Furthermore, Aida Esacove additionally represented to SANDS HARBOR that

it was premature to release the promissory note until the funds cured because she would then be

"subject to massive liability" and that the banking authorities would "take her down."

38.     In March, 2007, Guilot represented that the funds had in fact cured and that the

residual value insurance for the transaction was in place, but that the Loan Transaction could not

yet fund because the counterparty banks to the Loan Transaction demanded from EVMC a ten

day window in which to use the funds to trade international currencies and make profit. Mr.

Guilot confirmed that the loan transaction would close at the expiration of this ten-day period.

39.     Concerned over the increasing delays in closing the Loan Transaction, SANDS

11

HARBOR sought further assurance that EVMC had the capacity to lend and that the Loan

Transaction was legitimate.  Wells Fargo provided such assurances.

  40. Specifically, at the request of EVMC, by letter dated March March 29, 2007

(Exhibit H), and addressed, sent and delivered to SANDS HARBOR at its office in West Islip,

New York, Wells Fargo advised SANDS HARBOR that it had received:

> proof of funds on behalf of EVMC Real Estate Consultants, Inc. that easily
> exceeds the amount of $100,000,000 USD required for the Sand Harbor Marina
> Project.  These funds are from several major US Banks and are presented as
> reserved, blocked and in good, clean standing.  We can now complete and finalize
> our underwriting for the insurance on your project which as you know is the final
> step in getting this piece of the transaction completed.
>
> We look forward to working with you on the Sand Harbor project

  41. Significantly, the March 29, 2007 Wells Fargo letter addressed more than the

residual value insurance component of the Loan.  Wells Fargo apparently found it necessary to

assuage SANDS HARBOR's concerns over the Loan delays and prevent SANDS HARBOR

from backing out of the Loan by proofing funds and representing them to SANDS HARBOR to

be "reserved, blocked, and in good clean standing."  Wells Fargo also represented that these

funds – an amount in excess of $100,000,000.00 – were from "several major US Banks", leading

SANDS HARBOR to reasonably conclude that the funds would soon be available.  Wells Fargo

made these representations to SANDS HARBOR with the knowledge that SANDS HARBOR

would be relying upon them.

  42. SANDS HARBOR reasonably relied upon the representations in this Wells

Fargo letter, and continued to believe that the Loan – and EVMC itself – were legitimate.

SANDS HARBOR did not seek out alternative financing arrangements based upon the strength

of the Wells Fargo representations and continued to stay the course with EVMC.

43. About this time, the seller of the real property that is the subject of the Project also began to become uneasy regarding EVMC and its repeated delays. Guilot invited the seller to fly to Pittsburgh to verify the availability of funds. Guilot produced books and records purporting to show hundreds of millions of dollars in EVMC counterparty accounts and personally assured the seller that "the money for the Loan Transaction was in place" and that EVMC was just waiting for some incidental paperwork to be completed. Guilot provided the seller with letters and other documentation from Wells Fargo to confirm this. Guilot also had the seller speak with Wells Fargo directly as further evidence that the Loan would close. The seller reported back to SANDS HARBOR that the documents presented by Guilot, including the Wells Fargo letters and materials, and the conversation that he had with a Vice President for Wells Fargo, led him to believe that the Loan Transaction was legitimate and that the deal would close. The seller was particularly impressed with the representations made by Wells Fargo.

### *Wells Fargo's Subsequent Representations*

44. Six weeks after the last Wells Fargo letter, and after continued inexplicable delays by EVMC, SANDS HARBOR sought additional assurances from Wells Fargo that the Loan would close. This was especially important to SANDS HARBOR because SANDS HARBOR was becoming increasingly concerned that its contract with the seller would expire before the Loan would close and that time was running out to find alternative financing.

45. SANDS HARBOR informed Wells Fargo that it was contemplating backing out of the Loan. Wells Fargo persuaded SANDS HARBOR not to do so.

46. By letter dated May 17, 2007 (Exhibit I) and addressed, sent and delivered to SANDS HARBOR at its office in West Islip, New York, Wells Fargo further assured SANDS HARBOR that the Loan would close. Specifically, Wells Fargo stated that:

[w]e are pleased to confirm that we have been given bank verification of blocked/reserved funds which are clean, unencumbered and of non-criminal origin and set aside for your project in the amount of $105,000,000 USD.

We have also been informed that the final loan documents will be ready and presented on a timely basis for the anticipated closing scheduled sometime during the 1st week of June.

As a result of these final critical steps being accomplished as part of the closing process we have submitted all of the above to our insurer for final terms, conditions and commitments to prepare for policy issuance.

I am very excited to assist our client EVMC Real Estate Consultants, Inc. in the closing of your transaction.

47.     With this letter, Wells Fargo took the additional bold step of representing to SANDS HARBOR that the $105,000,000.00 was "set aside for your project" and represented for the second time that the funds were blocked, reserved, clean and unencumbered. Remarkably, Wells Fargo even represented that the funds were of "non criminal origin".

48.     In addition to the above letters addressed and delivered to SANDS HARBOR, Wells Fargo remained in constant contact with SANDS HARBOR during this time via email messages. In fact, it was not unusual for SANDS HARBOR to receive several emails a month during the time period from October 2006 through January 2008 from a Vice President at Wells Fargo assuring SANDS HARBOR that the Loan Transaction was legitimate and urging SANDS HARBOR to stay the course with EVMC.

49.     Wells Fargo continued to represent in these emails that Wells Fargo was in close contact with Aida Esacove and Guilot and that Wells Fargo had its finger on the pulse of the transaction. These emails from Wells Fargo were often in response to emails from SANDS HARBOR to Wells Fargo expressing concern over EVMC's continued delays. Without exception, Wells Fargo advised SANDS HARBOR to stay the course with EVMC and not back out of the transaction. At one point, Wells Fargo advised SANDS HARBOR that if SANDS

14

HARBOR backed out, the entire financing model built by Aida Esacove would "fall apart" like a "house of cards" and "no one would make money."

50.     On June 10, 2007, Guilot provided SANDS HARBOR with a SWIFT transfer credit advice document purporting to indicate that EVMC was the beneficiary of $500,000,000.00 from an overseas Citibank depositor (Exhibit J). Upon information and belief, this document was also provided to Wells Fargo. Guilot explained that one of EVMC's directors was traveling to Dubai (UAE) to meet with a minister for OPEC and arrange for additional funds for the Loan. Guilot explained that the counterparties would be working around the clock to finalize the transaction before the Middle Eastern vacation schedule at the end of July. Despite the increasingly unbelievable path that the Loan was beginning to take, Wells Fargo remained committed to EVMC and the Loan.

51.     By letter dated June 27, 2007 addressed and delivered to SANDS HARBOR, Guilot expounded on the above, stating

> I understand this has been a great strain on everyone involved and the process is nearly concluded with the institutions. Our group has been working around the clock to conclude the deal points of this transaction. As you know, our officers have been both here and abroad working diligently to complete the transaction as quickly as possible.

52.     On August 7, 2007, EVMC provided SANDS HARBOR with a letter (Exhibit K) indicating that "EVMC has a reserved blocked funds OPEC facility" and that the "sum of $1,022,000.00 has been earmarked for the [SANDS HARBOR] project." EVMC further represented that "we understand that your closing with your Sellers must be completed by Friday, August 31, 2007." Upon information and belief, EVMC also sent this letter to Wells Fargo.

53.     On August 29, 2007, EVMC transmitted to SANDS HARBOR a letter purporting to be from The OPEC Fund for International Development (Exhibit L) indicating that "the allocated project amount has been approved" for SANDS HARBOR and that transfer of the funds "will commence from the week of September 17 on, to the EVMC master escrow account held at National Real Estate Information Services."

54.     Despite this information, which obviously contradicted Wells Fargo's previous representations regarding the existence of "blocked" funds set aside for SANDS HARBOR and the Project, Wells Fargo remained committed to EVMC and continued to urge SANDS HARBOR to stay the course with EVMC. SANDS HARBOR did not learn until after the transaction fell apart that this document was a fraud and the "The OPEC Fund" was on an international watch list for fraudulent entities.

55.     In October 2007, SANDS HARBOR received a telephone call from Wells Fargo, indicating that the Loan closing would be imminent, as Wells Fargo had received word from EVMC that EVMC was finalizing a $500,000,000.00 bond offering, and that this vehicle would finally provide the funds for SANDS HARBOR. When SANDS HARBOR contacted Guilot and asked him to confirm this information, Guilot became evasive and told SANDS HARBOR that he could not talk about the bond issue because that information could only be released to EVMC's counterparty institutions such as Wells Fargo, and that SANDS HARBOR should take Wells Fargo at its word regarding the imminent availability of funds.

56.     In reliance on Wells Fargo's ongoing representations, SANDS HARBOR deposited the non-refundable sum of $100,000.00 with the seller in November, 2007 to secure another extension from the seller until January 31, 2008 to perform under the real estate contract.

57.     In further reliance on Wells Fargo's representations, SANDS HARBOR

continued to move forward with arrangements for the Project. Among other things, it made

payments totaling some $1.8 million to architects, engineers, attorneys and other professionals

involved with the Project. Again, throughout this time, SANDS HARBOR received emails

from Wells Fargo assuring SANDS HARBOR that the Loan Transaction was legitimate and that

it would close.

### EVMC Backs Out of the Transaction at the Eleventh Hour

58.     In December, 2007, Guilot represented that the Loan Transaction was being

handed off to EVMC's Florida closing attorneys, and that SANDS HARBOR's Florida counsel

would be contacted "within days" to set up a closing.

59.     In early January, 2008, SANDS HARBOR's counsel was contacted by EVMC's

Florida counsel to make arrangements for the closing. EVMC's counsel represented that "there

should be no problem closing the loan" by January 31, 2008.

60.     But on January 14, 2008 – a mere 12 days before the extended expiration date of

the contract for the Project – EVMC's Florida counsel emailed to the Corporation's counsel a list

of conditions precedent needed to be completed prior to closing of the Loan Transaction. These

conditions were never discussed in the entire prior 16-month history of the transaction.

61.     The list included conditions that were impossible for any borrower seeking

financing for an acquisition and development project to satisfy.

62.     When SANDS HARBOR attempted to contact EVMC to object to these

conditions, EVMC representatives, including Aida Esacove and Guilot – who had been in

constant communication with SANDS HARBOR for 16 months, during which they had

repeatedly given SANDS HARBOR increasingly firm assurances that the loan would close –

suddenly became unavailable. They did not take SANDS HARBOR's calls and did not respond

to SANDS HARBOR's emails or telephone messages.

63.   SANDS HARBOR, suddenly unable to contact EVMC, Aida Esacove or Guilot,

then notified Wells Fargo through the Vice President of Wells Fargo Insurance Services, Inc. that

it believed SANDS HARBOR was the victim of a massive financial scam. By email to SANDS

HARBOR dated January 22, 2008 from Mike_Reis@wellsfargois.com, a Vice President of

Wells Fargo – Michael Reis – stated:

> I know no one wants this project to fail!!!! Just hang in there. I have some
> leverage I am using that I've been saving.

64.   Later that day, Reis sent another email from Mike_Reis@wellsfargois.com to

SANDS HARBOR stating:

> I have said this to SANDS HARBOR all along. [speaking of EVMC] Frauds and
> scams do not spend money retaining multiple legal teams, hiring insurance/risk
> management advisors, I[nvestment] Bankers, etc.
>
> [EVMC] doesn't fit the fraud profile. Based on the docs I've seen and the
> bankers I've talked to they have been trying to get the deal funded. I'm told that
> they have in place the collateral needed in EVMC's name to structure the loan.
> The delay supposedly has been a [T&N] structural issue with the trustee bank
> who I know is a major AA int[ernational] name.
>
> I'm demanding proof for my insurers to keep me from pulling out and shutting
> down. House of cards from there.

65.   The following day, SANDS HARBOR reminded Wells Fargo that its contract

with the seller was expiring, and that SANDS HARBOR was not comfortable laying out any

additional extension fees in reliance upon Wells Fargo's involvement in the Loan Transaction or

representations as to the legitimacy of EVMC. SANDS HARBOR then asked EVMC to fund

the next extension fee to the seller as a good faith gesture of their commitment to the Loan

Transaction. Wells Fargo agreed with this strategy and sought to preserve the Loan Transaction

from falling apart despite EVMC's lack of contact with SANDS HARBOR.  By email dated

January 23, 2008, Reis stated:

> [SANDS HARBOR] is my client.  I have been told by Guilot that he will have the
> extension agreed upon for Sand Harbor and moving forward to execute within the
> next 12 hours.  I told him I will give him the 12 hours and then jump ugly on him.

66.    The following day, by email dated January 24, 2008, Reis emailed SANDS

HARBOR again, advising:

> Well I can tell you the amount of work night and day I have put into this for a
> year had been extensive.  I lost my family, my real estate and my credit.

67.    As it became increasingly apparent that EVMC had no intention of closing the

Loan and that SANDS HARBOR would suffer significant damages, SANDS HARBOR advised

Wells Fargo that "no one can expect this to happen to everyone and that there be no retribution."

Reis responded by email:

> Agreed.  I just want it to fund so we all can make money!!!

68.    The following day, by email dated January 25, 2008, Reis further advised SANDS

HARBOR:

> I talked to Aida [Esacove] today regarding Sand Harbor's fast approaching
> deadline.  She has assured me that once [her call with her attorneys] ended she
> will call me immediately to let me know.
> I have also talked to our legal folks here and they wanted to make sure that I
> reminded you and EVMC about our Wells Fargo privacy/confidentiality policies
> which are in place to protect both of you as clients of our firm.  I have tried to
> help be a buffer between you and EVMC to help resolve this issue however you
> need to understand that I cannot jeopardize my role as a representative of Wells
> Fargo/Wells Fargo Insurance.

### *SANDS HARBOR's Contract to Purchase the Real Property Expires*

69.    The extended deadline for SANDS HARBOR to purchase the property under its contract

with the seller was scheduled to expire on January 31, 2008.  Having already spent $600,000 to

extend the expiration date based on EVMC's repeated false assurances of financing the Project,

19

and in light of the unreasonable conditions that EVMC was suddenly seeking to impose and the fact that EVMC's representatives were suddenly making themselves unavailable to SANDS HARBOR to discuss the matter, SANDS HARBOR simply could not afford to spend additional monies to further extend the contract. Accordingly, the deadline to perform under the contract passed and SANDS HARBOR lost its contract deposit.

70.     Throughout the 16-month period, SANDS HARBOR had given assurances to various third parties, including vendors and its own investors, that the Project would move forward in reasonable reliance on the representations of Wells Fargo. SANDS HARBOR's inability to close the loan and move forward with the Project – in addition to causing SANDS HARBOR the financial losses summarized above – has severely and irreparably harmed the credibility of SANDS HARBOR and its principals.

71.     Adding insult to injury, EVMC actually had the temerity to send SANDS HARBOR an invoice for $15,570,000.00 for fees purportedly due EVMC pursuant to the parties agreement (Exhibit M).

72.     Subsequent to EVMC's failure to perform in January 2008, SANDS HARBOR learned the following disturbing facts about Aida Esacove, Larry Esacove, EVMC, and T&N, all of which Wells Fargo knew, or should have known, or should have discovered. These disturbing facts painted a far different picture of EVMC, Aida Esacove and Guilot than the picture painted by Wells Fargo:

(a)     As early as 1995, Aida Esacove and Larry Esacove were under suspicion for conducting elaborate financial scams. By letter dated April 18, 1995 (Exhibit N) addressed to Tisdale & Nicholson, Rosen, McCarthy – a law firm that previously represented the Esacoves – advised Guy Nicholson that the firm had been "interviewed by agents of the FBI, Secret

20

Service and the California Department of Justice, on behalf of Interpol, concerning the activities

of the Esacoves and their associates." A document filed in court by Rosen, McCarthy stated that

the firm had been retained by the Esacoves to negotiate the Esacove's sale of $625,000,000.00 in

bank notes guaranteed by the Kizu Trust Bank of Osaka, Japan. Rosen, McCarthy later learned

that the bank notes that the Esacoves attempted to sell were not bona fide and, upon reporting

this finding to the Esacoves, the Esacoves "attempted to suppress this information and expressed

their intent to sell the notes anyway" and "continued to represent to the public" that the notes

were legitimate and guaranteed. The Federal Bureau of Investigation eventually interrupted a

meeting and physically seized the fraudulent bank-issued promissory notes.

(b)     In 2003, Aida Esacove, Larry Esacove and John C. Jeffers were co-

defendants in a civil action (03-CV-1663, United States District Court: Central District of

California) seeking damages for fraud, RICO and the operation of a Ponzi-like scheme (termed a

"roll trading program") , in which it was alleged that Aida Esacove and Larry Esacove stole

more than $250,000.00 from an individual who believed he was investing with legitimate

investment professionals. Later, in 2005, Esacove co-defendant Jeffers was sentenced to 14

years in federal prison by U.S. District Judge Robert Timlin for his role in an investment scheme

in which he and others defrauded victims out of $26,000,000.00 under the guise of a "high yield

investment program" that he represented was made possible by trading bank-issued promissory

notes.

(c)     In 1996, Aida Esacove, Larry Esacove and T&N were co-defendants in a

federal civil action entitled Rischer v. Banlavoura I 96-CV-3886 (United States District

Court:Central District of California) (in which Aida Esacove, Larry Esacove, Tisdale &

Nicholson, and Jeffrey A. Tisdale were also named as individual defendants) seeking damages

21

for, *inter alia*, fraud, RICO, violations of various securities laws and for operating a Madoff-like

Ponzi scheme. On February 18, 1998 an order was entered granting judgment against Aida

Esacove, Larry Esacove and their accomplices in the amount of $6,000,000.00. Remarkably,

despite the passage of over ten years since entry of the judgment, upon information and belief,

the Esacoves have been successful in thwarting the efforts of the judgment creditor by

transferring assets out of their names, moving assets overseas and filing frivolous appeals and

counterclaims with the intent of wearing down the will of the judgment creditor to proceed.

        (d)    On November 4, 2004 – less than two years before the first of the Wells

Fargo representations regarding the Esacoves – an Arrest Warrant for the seizure of Aida

Esacove and Larry Esacove for theft and embezzlement in the amount of $728,000.00 was issued

by Judge Karen J. Nudell of the Superior Court of California, County of Los Angeles, alleging

violation by Plaintiffs of California Penal Code:

        (1) 368 (d) Felony Theft of Elder Property;

        (2) 487 (a) Felony Grand Theft; and

        (3) 487 (a) Felony Grand Theft.

Aida Esacove and Larry Esacove were forced to make restitution and pay penalties to

avoid serving additional jail time. To this day, Aida Esacove's case remains open in the State of

California Criminal Justice System while she awaits sentencing for her crimes. A copy of the

Felony Complaint for Arrest Warrant from the Superior Court of the State of California, County

of Los Angeles is annexed hereto as Exhibit O;

        (e)    According to the Assistant District Attorney prosecuting the Esacoves,

Aida Esacove was prohibited from engaging in any financial "schemes" or holding herself out to

the public in any financial capacity whatsoever pending her sentencing, which has still not

occurred;

        (f)      Upon information and belief, neither Aida Esacove nor EVMC hold a

license from any state to make, broker, arrange or provide financing of any kind . Accordingly,

neither EVMC nor Aida Esacove was licensed to provide the services contemplated under the

Loan;

        (g)      Upon information and belief, the SWIFT transfer and OPEC letter were

forgeries administered and passed along by Guilot, Aida Esacove and EVMC.

        (h)      Upon information and belief, EVMC was nothing more than a shell

corporation which Aida Esacove used as her alter ego for the purpose of defrauding potential

investors in one of her many financial scams.

        (i)      Upon information and belief, EVMC never closed a loan.

        (j)      Upon information and belief, Aida Esacove never closed a loan.

        (k)      On June 2, 2006 – a full two years before the written Wells Fargo

representations to SANDS HARBOR – Guilot filed for bankruptcy protection in the Western

District of Pennsylvania and later testified in an unrelated judgment enforcement action against

Aida Esacove that he "worked odd jobs around a farm." Upon information and belief, Guilot –

experiencing financial difficulties and in the midst of bankruptcy – agreed to work as the "front

man" for Aida Esacove's latest con in exchange for financial assistance in getting himself out of

bankruptcy and saving his home from the bankruptcy trustee. Indeed, in or about February,

2008, Larry Esacove submitted an application to the bankruptcy court indicating that he would

purchase Guilot's house out of bankruptcy. Guilot's bankruptcy was pending during the entire

time that Wells Fargo was working with EVMC.

73.     In summary, SANDS HARBOR discovered after the fact that Wells Fargo had

been making positive representations about, urging SANDS HARBOR to trust, and endeavoring

to provide tens of millions of dollars in residual value insurance for, an entity that was

unlicensed to lend and had never closed a loan, run by a woman with a history of being sued for

financial fraud who currently has a $6,000,00.00 federal civil judgment against her (currently

over $10,000,000 with accrued interest), who was also recently arrested for fraud and

embezzlement and is awaiting sentencing, who has accomplices currently serving time in prison,

and managed by an individual working odd jobs around a farm and in bankruptcy. Although

SANDS HARBOR fell victim to EVMC's and Aida Esacove's latest scam, SANDS HARBOR

was equally victimized by Wells Fargo's failure to perform even an iota of due diligence on Aida

Esacove, Larry Esacove or EVMC. Given the Esacove's sordid history, it is simply baffling that

Wells Fargo glibly continued to represent to SANDS HARBOR that these individuals were

legitimate business persons.

74.     Upon information and belief, Wells Fargo – and by virtue of his position within

Wells Fargo, one of its Vice Presidents – had a tremendous vested financial interest in EVMC

and was in position to earn a six-figure commission if the Loan funded. Upon information and

belief, this provided Wells Fargo with the incentive to look the other way and hope for the best

with EVMC. Unfortunately, Wells Fargo severely damaged SANDS HARBOR as a result.

75.     Upon information and belief, EVMC, Aida Esacove and Guilot conceived the

Loan transaction as a conduit to defraud SANDS HARBOR (and others like it) out of money,

and EVMC's eleventh hour closing conditions were part of the pre-conceived plan for a plausible

exit strategy to the con. As set forth above, Aida Esacove and Guilot were even brazen enough

to send SANDS HARBOR an invoice for fees earned by EVMC in connection with the con.

## FIRST CLAIM FOR RELIEF AGAINST WELLS FARGO
### *(Fraud)*

76.     SANDS HARBOR repeats and realleges the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77.     In October 2006, Wells Fargo represented to SANDS HARBOR that EVMC and its principals were long-standing clients of Wells Fargo, impliedly assuring SANDS HARBOR that EVMC was a legitimate lender.

78.     From October 2006 through January 2008, Wells Fargo made representations to SANDS HARBOR to the effect that closing on the financing was both certain and imminent, all as set forth more fully in Exhibits B through F, H and I hereto.

79.     Wells Fargo knew at the time it made these representations that they were materially false and misleading.

80.     Wells Fargo made these false and misleading statements of facts with the intention to deceive and mislead SANDS HARBOR, to induce SANDS HARBOR to initiate and then continue to move forward with its efforts to secure financing from EVMC for the Project.

81.     SANDS HARBOR did not know and reasonably could not have known at the time that EVMC did not intend to close the financing with SANDS HARBOR.

82.     SANDS HARBOR would not have proceeded with EVMC, but for the representations of Wells Fargo.

83.     As a direct and proximate result of its reasonable reliance on Wells Fargo's fraudulent misrepresentations, SANDS HARBOR has suffered losses in at least the sum of $6,472,000, representing the $1,022,000 payment it made to EVMC, the $3,050,000 downpayment it made to the seller, the $600,000 in subsequent fees it paid seller to extend the contract and the $1,800,000 it paid to vendors and consultants for the Project such as architects,

25

engineers and lawyers.

84.     In addition, Wells Fargo's intentionally tortious conduct was so egregious, amounting to a fraud against the public, that SANDS HARBOR should also be awarded punitive damages in the sum of at least $10 million.

## SECOND CLAIM FOR RELIEF AGAINST WELLS FARGO
### *(Negligent Misrepresentation)*

85.     SANDS HARBOR repeats and realleges the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

86.     Throughout the course of the events set forth herein Wells Fargo represented to SANDS HARBOR that EVMC and its principals were long-standing clients of Wells Fargo, impliedly assuring SANDS HARBOR that EVMC was a legitimate lender.

87.     From at least December 2006 through December 2007, Wells Fargo made representations to SANDS HARBOR to the effect that closing on the financing was both certain and imminent, and that EVMC had access to at least $105,000,000 in financing earmarked for SANDS HARBOR, all as set forth more fully in Exhibits H and I hereto.

88.     Wells Fargo should have known at the time it made these representations that they were materially false and misleading.

89.     It was foreseeable when Wells Fargo made these negligent misrepresentations of fact that SANDS HARBOR would rely on them by proceeding to seek financing from EVMC for the Project.

90.     SANDS HARBOR did not know and reasonably could not have known at the time that EVMC did not intend to close the financing with SANDS HARBOR.

91.     SANDS HARBOR would not have proceeded with EVMC, but for the representations of Wells Fargo.

26

92.    As a direct and proximate result of its reasonable reliance on Wells Fargo's

negligent misrepresentations, SANDS HARBOR has suffered losses in at least the sum of

$6,472,000, representing the $1,022,000 payment it made to EVMC, the $3,050,000 down

payment it made to the seller, the $600,000 in subsequent fees it paid seller to extend the contract

and the $1,800,000 it paid to vendors and consultants for the Project such as architects, engineers

and lawyers.

## THIRD CLAIM FOR RELIEF AGAINST WELLS FARGO
### *(Common Law Negligence)*

93.    SANDS HARBOR repeats and realleges the allegations contained in paragraphs

1 through 75 as if fully set forth herein.

94.    As EVMC's insurance underwriter for the loan transaction with SANDS

HARBOR, Wells Fargo owed SANDS HARBOR a duty of care to act as a reasonable

underwriter in assuring that EVMC had the financial wherewithal, *bona fides* and intent to close

the transaction.

95.    Wells Fargo breached its duty of care owed to SANDS HARBOR by failing to

exercise reasonable due diligence in advising SANDS HARBOR that EVMC's closing on the

financing was both certain and imminent, all as set forth more fully in Exhibits B through F, H

and I hereto.

96.    It was foreseeable that SANDS HARBOR would rely on Wells Fargo's

assurances by proceeding to seek financing from EVMC for the Project.

97.    As a direct and proximate result of Wells Fargo's negligent breaches of its duty

of care owed to SANDS HARBOR, SANDS HARBOR has suffered losses in at least the sum of

$6,472,000, representing the $1,022,000 payment it made to EVMC, the $3,050,000

downpayment it made to the seller, the $600,000 in subsequent fees it paid seller to extend the

27

contract and the $1,800,000 it paid to vendors and consultants for the Project such as architects, engineers and lawyers.

98.    As a further direct and proximate result of Wells Fargo's negligent breaches of its duty of care owed to SANDS HARBOR, SANDS HARBOR has suffered damages in an amount to be determined at trial, representing SANDS HARBOR's loss or reputation with its vendors and investors.

99.    As a further direct and proximate result of Wells Fargo's negligent breaches of its duty of care owed to SANDS HARBOR, SANDS HARBOR has suffered damages in an amount to be determined at trial representing the profit it would have realized had it been able to close on the financing and proceed with the Project.

## FOURTH CLAIM FOR RELIEF AGAINST WELLS FARGO
### *(Breach of Fiduciary Duty)*

100.    SANDS HARBOR repeats and realleges the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

101.    As EVMC's insurance underwriter for the loan transaction with SANDS HARBOR, Wells Fargo owed SANDS HARBOR a fiduciary duty to assure that EVMC had the financial wherewithal, *bona fides* and intent to close the transaction.

102.    Wells Fargo breached its fiduciary duty owed to SANDS HARBOR by failing to exercise reasonable due diligence in advising SANDS HARBOR that EVMC's closing on the financing was both certain and imminent, all as set forth more fully in Exhibits B through F, H and I hereto.

103.    It was foreseeable that SANDS HARBOR would rely on Wells Fargo's assurances by proceeding to seek financing from EVMC for the Project.

104.    As a direct and proximate result of Wells Fargo's breaches of its fiduciary duty

28

owed to SANDS HARBOR, SANDS HARBOR has suffered losses in at least the sum of

$6,472,000, representing the $1,022,000 payment it made to EVMC, the $3,050,000

downpayment it made to the seller, the $600,000 in subsequent fees it paid seller to extend the

contract and the $1,800,000 it paid to vendors and consultants for the Project such as architects,

engineers and lawyers.

105.    As a further direct and proximate result of Wells Fargo's breaches of its fiduciary

duty owed to SANDS HARBOR, SANDS HARBOR has suffered damages in an amount to be

determined at trial, representing SANDS HARBOR's loss or reputation with its vendors and

investors.

106.    As a further direct and proximate result of Wells Fargo's breaches of its fiduciary

duty of care owed to SANDS HARBOR, SANDS HARBOR has suffered damages in an amount

to be determined at trial representing the profit it would have realized had it been able to close on

the financiang and proceed with the Project.

### FIFTH CLAIM FOR RELIEF AGAINST WELLS FARGO
### *(Unjust Enrichment)*

107.    SANDS HARBOR repeats and realleges the allegations contained in paragraphs

1 through 75 as if fully set forth herein.

108.    Upon information and belief, a portion of the $1,022,000.00 wired by SANDS

HARBOR to T&N was paid to Wells Fargo at the instruction of EVMC as an upfront premium

or binder for the residual value insurance.

109.    Upon information and belief, EVMC caused this initial money to be sent to Wells

Fargo in furtherance of EVMC's financial scam.  Upon information and belief, EVMC used this

upfront premium or binder payment to engage Wells Fargo and provide EVMC with the

appearance of legitimacy.

110.   Wells Fargo knowingly received this money and was unjustly enriched thereby at the expense of SANDS HARBOR.

111.   It would be unjust for Wells Fargo to retain this money and SANDS HARBOR is therefore entitled to restitution.

WHEREFORE, SANDS HARBOR respectfully requests that the Court grant the following relief

(a)   Judgment against Wells Fargo on the First Claim for Relief awarding SANDS HARBOR compensatory damages of at least $6,472,000, plus interest, together with punitive damages of $10,000,000.

(b)   Judgment against Wells Fargo on the Second Claim for Relief awarding SANDS HARBOR compensatory damages of at least $6,472,000, plus interest.

(c)   Judgment against Wells Fargo on the Third and Fourth Claims for Relief awarding SANDS HARBOR $6,472,000, plus interest, together with additional damages in an amount to be determined at trial for SANDS HARBOR's loss of reputation and lost profits.

(d)   Judgment against Wells Fargo on the Fifth Claim for Relief awarding SANDS HARBOR an amount to be proven at trial.

(e)   The costs of this action, including SANDS HARBOR's reasonable attorneys' fees.

(e)   Such other and further relief as the Court deems just and proper.

Dated:  Melville, New York
            August 31, 2009                                  Respectfully submitted,

                                                                    Roy A. Klein (RAK-9850)
                                                                    Attorney for Plaintiff
                                                                    532 Broad Hollow Road #144
                                                                    Melville, NY 11747
                                                                    631-777-1313

# Exhibit A

## EVMC Real Estate Consultants, Inc

### Format of Structuring

The structure is in multiple components.

1st Submitting the project to EVMC's risk management and underwriting group (Acordia) for risk analysis/due diligence.

2nd For support of the project there is a need for Collateral "investment grade securities" as a requirement for issuing the transaction-specific risk management and insurance enhancements.

3rd Funding Consortium (Banks) or QIB's

4th Post project funding all asset protection, risk management and insurance coverage will be placed on behalf of project for the entire term of the loan to ensure adequate protection of bank's and EVMC's investment.

This will include corporate property, liability & management liability insurance, course of construction/builder's risk insurance, loss control and safety programs as well as all ongoing insurance to cover project's product liability, premises operations and employer's liability where applicable.

# Exhibit B



Acordia
222 SW Columbia Street
Portland, OR 97201
Phone: 503.293.9500
Toll Free: 800.456.1586
Fax: 503.293.9599

www.acordia.com

October 13, 2006

Mike Haley
Sands Harbor Marina LLC
101 Davison Lane West
West Islip, NY 11795

Re:    Residual Value Insurance for Sand Harbor Project

Dear Mr. Haley:

This letter is to inform you that we have submitted your project package to our London
insurance partners on behalf of our client EVMC Real Estate Inc. for the purpose of
structuring a Residual Value Insurance policy around the real estate development project.

EVMC has required this enhancement as part of their project finance structure. We will
provide a formal quote to EVMC subject to all due diligence and project funding
commitments being met.

Sincerely,

Michael D. Reis, ARM
Vice President
(503) 768-3530 Direct

# Exhibit C



Acordia
222 SW Columbia Street
Portland, OR 97201
Phone: 503.293.9500
Toll Free: 800.456.1506
Fax: 503.293.9599

www.acordia.com

October 20, 2006

Mike Haley
Sands Harbor Marina LLC
101 Davison Lane West
West Islip, NY 11795

Re:   Residual Value Insurance for Sand Harbor Project

Dear Mr. Haley:

This letter is to inform you that we are processing your project package with our London-based insurance company on behalf of our client EVMC Real Estate Inc. for the purpose of structuring a Residual Value Insurance policy around the real estate development project.

The insurance company has confirmed that the Sand Harbor development project will be insured as part of EVMC's financing structure.

We will forward an indicative quote sheet the first part of next week for your reference.

Sincerely,

Michael D. Reis, ARM
Vice President

A Member of the HILB global Network.

# Exhibit D



222 SW Columbia Street
Portland, OR 97201
Phone: 503.293.9500
Toll Free: 800.456.1506
Fax: 503.293.9599

www.acordia.com

October 25, 2006

Mike Haley
Sands Harbor Marina LLC
101 Davison Lane West
West Islip, NY 11795

Re:     Residual Value Insurance for Sand Harbor Project

Dear Mr. Haley:

As discussed last week we have confirmed that the Sand Harbor project will be insured
through our London insurer. I have attached the master EVMC term sheet of coverage. When
EVMC's funding source commits to the Sand Harbor project specifically you will get a
specific term sheet of coverage from us.

In addition, our insurer has informed us that they will require you to get the full
appraisal/feasibility done on the entire project, not just the real estate acquisition piece.

Please contact EVMC with questions you may have regarding the insurance.

Sincerely,

Michael D. Reis, ARM
Vice President



19th October 2006

EVMC Real Estate Consultants Inc.

Dear Sir,

We are pleased to offer an initial non binding indication of terms for Residual Value Insurance as follows:

RVI Policy Form to be agreed by all parties.

Name of Insured/Loss Payee:     To be advised

Period:                          Minimum 10 years (effective date to be advised)

Details of Transactions:         Various Projects as on file with Insurative

Details of Collateral:           Land and Property as scheduled

Coverage:                        Residual Value of 25% of Appraisal Valuation

Premium:                         (Representing a rate of between 6.00% to 6.25% of Sum Insured, plus Tax as applicable)

                                 An initial arrangement/due diligence fee of
                                 € / $ 15,000 is payable.  (This fee is due irrespective of whether the Insured purchases the coverage)
                                 Payment details will be provided under separate cover

Insurer:                         Minimum A- (AM Best rated)

The above indication is subject to information requested by the Insurer and to include :

1. Confirmation of full transaction details from the Insured (Bank)
2. Appraisal value of collateral, appraisal date
3. Signed and dated application form

Yours faithfully,

David Arbuary.

c.c.     Mike Reis
         Acordia of Oregon, Inc

# Exhibit E



**Acordia**
222 SW Columbia Street
Suite 1250
Portland, OR 97201
Phone: 503.293.9500
Toll Free: 800.456.1506
Fax: 503.293.9599

www.acordia.com

December 4, 2006

Dennis J. Seidel
NatCity Private Client Group
NatCity Investments, Inc.
1000 RIDC Plaza, Suite 300
Pittsburgh, PA 15238

Re:     EVMC Project Finance Structure – Sand Harbor LLC

Dear Mr. Seidel:

This letter is to confirm our commitment in providing an insurance binder for Residual Value
insurance on the Sand Harbor LLC project to be effective once the engagement contract is
signed by the bank and we have received the funding commitment. Our binder will be
effective simultaneous with the bank closing to ensure it matches all closing documents for
Sand Harbor LLC.

If you have any questions please feel free to call me. We look forward to mutually closing this
transaction for Sand Harbor LLC.

Sincerely,

Michael D. Reis, ARM
Vice President

Cc: EVMC Real Estate Consultants, Inc.

A Wells Fargo Company

A Member of the ___ global Network.

# Exhibit F



December 6, 2006

Mike Haley
Sands Harbor Marina LLC
101 Davison Lane West
West Islip, NY 11795

Re:    Confirmation of NatCity Commitment

Dear Mr. Haley:

This letter is to confirm receipt of the executed commitment to EVMC by NatCity
representing the bank responsible for funding the Sand harbor LLC project in the amount of
$100,022,100 USD.

We will be coordinating the insurance which is structured around the transaction with NatCity
shortly.

Sincerely,

Michael D. Reis, ARM
Vice President

Cc: EVMC Real Estate Constants, Inc.

# Exhibit G

Dec.21. 2006  7:27PM    DIVERSE PLANNING GROUP, Inc.                   No.9131   P. 1

## *EVMC Real Estate Consultants, Inc*

December 21, 2006

<u>CONFIDENTIAL</u>

Mr. Michael Haley
Sands Harbor Marina LLC
101 Davidson Lane West
West Islip, NY 11795

      Re:  Proposed Loan

Dear Mr. Haley:

You have requested, on behalf of Sands Harbor Marina LLC, a Florida limited liability company, that EVMC Real Estate Consultants, Inc. ("EVMC") arrange a loan (the "Loan") to be extended to it.  Sands Harbor Marina LLC (the "Borrower") is a new, single purpose, shell limited liability company recently formed.  This preliminary letter outlines the framework for a loan, but does not constitute a commitment or a contract of any kind.  Subject to that qualification, EVMC is hereby pleased to consider extending to the Borrower a Loan as follows:

     1.    <u>Project</u>: acquisition and development of a four acre waterfront parcel of land with existing and operating hotel, marina and commercial buildings with active businesses located in the Intercoastals of Pompano Beach, Florida.

     2.    <u>Loan Amount and Funding</u>.

        (a)    The Loan amount will be $100,022,100 (the "Loan Amount"). The Loan Amount was calculated using the assumptions and requirements reflected in documents provided by Borrower and Borrower's agents.  Loan advances will be made in accordance with a cash flow schedule approved by EVMC and Acordia on behalf of the residual value insurer for the Project.

     3.    <u>Maturity Date</u>.  The Loan will mature on the earlier of one hundred eighty (180) days after the bonded delivery date of the Project under the applicable surety bond, but in any event no later than ten (10) years after the Loan closing date.

     4.    <u>Rate(s)</u>.

        (a)    <u>Interest Rate(s)</u>.  The unpaid balance of the Loan shall bear interest at a per annum fixed rate for the term of the Loan equal to 150 basis points over one year Libor, as set at closing of the Loan.  All interest shall be calculated on the basis of a 360-day year for actual days elapsed and will be payable monthly in arrears.

(b)      Interest Payments.  Interest will be charged to an interest reserve drawn from the Loan Amount  and added to the balance of the Loan.  Interest accruing on the loan in excess of the reserve amount shall be paid by the Borrower on each interest payment due date thereafter.

(c)      Default Rate.  If any event of default occurs under the Loan then from the date such event of default occurs until it is cured or until all obligations are paid and performed in full, the Borrower will pay interest on the unpaid balance of the Loan at a per annum rate five percent (5%) greater than the applicable rate of interest.

5.     Fees.  The Borrower shall pay EVMC the following fees:

(a)      Loan Fee.  a one-time closing fee of $400,000 which shall be payable on the closing date of the Loan.

(b)      Contingent Loan Fees.  Borrower will pay EVMC contingent loan fees (the "Contingent Loan Fees") equal to fifteen percent (15%) (the "Contingent Loan Fee Percent") of all gross revenues (the "Gross Revenues") of the Project, capped at $2,000,000.  Payment of the Contingent Loan Fees shall be deferred until Full Recoupment (defined below) and, if applicable, Manager's Recoupment (assuming Mike Haley is the sole manager of the Borrower for compensation) (such deferred fees being hereinafter referred to as "Deferred Contingent Loan Fees").  Thereafter, until all Deferred Contingent Loan Fees have been paid in full, fifty percent (50%) of the Gross Revenues shall be paid to and allocated by EVMC, first to Contingent Loan Fees accruing after the Full Recoupment and, if applicable, Manager's Recoupment have been paid in full and the balance to the Deferred Contingent Loan Fees.  After the Deferred Contingent Loan Fees have been fully paid, EVMC shall receive the Contingent Loan Fee Percent of all future Gross Revenues until EVMC receives $2,000,000 in aggregate Contingent Loan Fees.

6.    Disbursement of Revenues.

(a)      All of the gross revenues and other proceeds generated by the Project and all other collateral, without deduction or offset, shall be paid to a Project account for the benefit of EVMC until the Loan and all obligations owing to EVMC, including all principal, interest, fees (except the Contingent Loan Fees), and out of pocket costs, have been repaid in full ("Full Recoupment").

(b)      Following Full Recoupment, Manager(s) will be entitled to recoup up to 50% of his/their deferred Manager's fee ("Manager's Recoupment") from revenue **provided that the following conditions are met**: (i) the amount of contracts for acceptable buyers of the Project ("Primary Contracts") equals Full Recoupment; and (ii) the sum of the (1) the amount of any cash collateral pledged to EVMC, and (2) the amount of any remaining reserve, exceeds the Commitment Amount sufficient to pay all such amounts plus Manager's proposed fee.  If these conditions are not met, then

immediately following Full Recoupment, EVMC shall begin recoupment of the Deferred Contingent Loan Fees, as detailed under Paragraph 5(b).

(c)      If the conditions for Manager's Recoupment as detailed in Paragraph 6(b) are fulfilled, once Manager's Recoupment has occurred, then EVMC shall begin to recoup its Deferred Contingent Loan Fee as detailed under Paragraph 5(b) above.

7.     Collateral.  Repayment of the Loan and all other liabilities, indebtedness and obligations of the Borrower to EVMC shall be secured by a valid, perfected, first priority security interest in all of the Borrower's present and future assets, wherever located, including but not limited to, all property whether real or personal, improvements on real estate, leases, [oil and gas/ mineral rights or leases therein,] surface rights, copyrights, trademarks, accounts, bank deposit and Project accounts, collection accounts, the right to receive any tax refunds, inventory, equipment, instruments, documents, fixtures, chattel paper, contract rights, general intangibles, and all proceeds of the foregoing, including, but not limited to and all funds arising from construction and exploitation of the Project.

8.     Personal Guarantees:  to be obtained from each of Michael Haley, Charles Haley, Gary Lukas and Anthony Rigole.

9.     Conditions Precedent.  The extension of the Loan is subject to the fulfillment of a number of conditions, including, but not limited to, the following:

(a)      The execution and delivery, in form and substance acceptable to EVMC and its counsel, of customary agreements, documents, surety guarantees, instruments, deeds of trust/mortgages, inter-party agreements, subordination agreements, guarantees, financing statements, consents, evidences of corporate authority, certificates, insurance certificates evidencing that the Borrower has obtained title, residual value and any other requested insurance in amounts and with coverages satisfactory to EVMC, opinions of counsel, and such other writings to confirm and effectuate the financing arrangements as may be required by EVMC and its counsel.

(b)      The loan and security agreement for the Loan shall contain such representations and warranties, and such affirmative and negative covenants as EVMC deems appropriate for this transaction.  The loan and security agreement shall include restrictions acceptable to EVMC, on distributions, indebtedness, acquisitions, investments, loans and a provision for resolving all disputes that may arise after the closing of the Loan through arbitration proceedings.

(c)      The ownership, legal status and tax status of the Borrower are to be acceptable to EVMC, and any changes thereto are to be subject to EVMC's prior written approval.

(d)      The Borrower owns all right, title and interest in and to the Project throughout the universe and in perpetuity.

(e)    Completion of the Project shall be insured by a surety bond and an insurance company providing Residual Value Insurance acceptable to EVMC in its sole and absolute discretion. EVMC shall be named as the beneficiary of the surety bond. The terms of the surety bond are to be acceptable to EVMC in its sole and absolute discretion. The surety shall contain "cut-through" endorsements as may be required by EVMC and provide, among other things, that the surety agrees to (i) deliver or provide access to the applicable sales agent and to all current and future buyers, by specified dates, the completed Project and all other items which are a condition precedent to the payment of all minimum payments due under those contracts and to a drawing under any supporting letters of credit, subject only to the sales agent's right to pre-approve such delivery terms; (ii) consult with the sales agent regarding the physical elements of the Project that may be offered as delivery items to current and future buyers; (iii) undertake its obligations under the surety upon EVMC making available to the surety an amount equal to the Loan (net of EVMC's fees, expenses, and reserves) in accordance with the approved draw down schedule, as it may be varied with the consent of the surety and EVMC; and (iv) be liable for any additional interest costs and foreign exchange expense incurred that are not covered by EVMC's interest and fee reserves if the surety requires the approved cash flow for the Project to be accelerated during production.

(f)    A final budget for the Project approved by EVMC, Acordia and the residual insurance company.

(g)    A final cash flow schedule for the Project approved by EVMC, Acordia and the surety guarantor.

(h)    EVMC shall have the right to approve all of current and future buyers and the terms of all purchase contracts. All buyers shall acknowledge EVMC's right to the proceeds of the purchase contracts and agree to deposit such proceeds, without deduction, into the Borrower's collection account as directed by EVMC.

(i)    Lien subordination agreements, and such third party lien releases and subordinations as EVMC may require in its sole discretion.

(j)    Sales estimates for the Project prepared by an independent sales agent, based on the final budget. Such sales estimates must be accompanied by a list of the assumptions used in preparing the estimates along with the signature(s) of the person(s) who prepared the estimates.

(k)    The Borrower and the sales agent shall only enter into purchase contracts for the Project: (i) with Primary Purchasers and other persons and companies, except persons and companies whom EVMC has identified as being unacceptable buyers for the Project under any circumstance; and (ii) which meet all of the criteria for a Primary Contract other than the requirement that the buyer is a Primary Purchaser.

(l)    The Borrower shall maintain Project accounts and collection accounts at a bank deemed acceptable to EVMC. All Loan advances shall be deposited

into the Project accounts. All proceeds of the Project and other collateral shall be deposited into the collection account. The Borrower will pay bank's standard fees in connection with such accounts.

      (m)   EVMC will receive financing credits and mention in all press releases for the Project, all in form and substance acceptable to EVMC.

As indicated above, this letter is merely a proposal, and is not to be construed as a commitment to lend. The summary of terms and conditions contained herein is not meant to be nor should it be construed as an attempt to define all terms and conditions of the loan proposed hereby, nor is it intended to reflect specific document phrasing that will exist in the loan documents. It is intended only to outline some basic points of business understanding.

This letter may not be delivered or disclosed to any third party, except to persons who are in a confidential relationship with the Borrower, such as Borrower's legal counsel, accountants or financial advisors.

This proposal will expire on December 28, 2006, unless this letter is signed by you and returned to EVMC. We will then proceed with our review, evaluation and documentation of this transaction. We look forward to working with you on this transaction.

Sincerely,

EVMC Real Estate Consultants, Inc.

By: _____

Esther Vargas, Director

Agreed and Accepted: December __, 2006
By: _____
    Michael Haley

5

# Exhibit H



**WELLS FARGO**

MAC P6181-120
222 SW Columbia Street
Suite 1250
Portland, OR 97201
503.293.9500 Voice / 503.293.9599 Fax
800.456.1506 Toll Free
first_last@wellsfargois.com

Wells Fargo
Insurance Services
of Oregon, Inc.

March 29, 2007

Mr. Michael Haley
Sand Harbor Marina, LLC
101 Davison Lane West
West Islip NY   11795

RE:  Verification of project funds – Sand Harbor Marina Project

Dear Mr. Haley,

This letter is to confirm that we have received proof of funds on behalf of EVMC Real
Estate Consultants, Inc., that easily exceeds the amount of $100,000,000 USD required
for the Sand Harbor Marina Project.  These funds are from several major US banks and
are presented as reserved, blocked and in good, clean standing.  We can now complete
and finalize our underwriting for the insurance on your project which as you know is the
final step in getting this piece of the transaction completed.

We look forward to working with you on the Sand Harbor project.

Sincerely,

WELLS FARGO INSURANCE SERVICES OF OREGON, INC.

*Michael Reis / KMB*

Michael D. Reis, ARM
Vice President

# Exhibit I



**WELLS FARGO**

MAC P6181-120
222 SW Columbia Street
Suite 1250
Portland, OR 97201
503.293.9500 Voice / 503.293.9599 Fax
800.456.1506 Toll Free
first_last@wellsfargo.com

Wells Fargo
Insurance Services
of Oregon, Inc.

May 17, 2007

Mike Haley
Sands Harbor Marina LLC
101 Davison Lane West
West Islip, NY 11795

Re:     $105MM Sand Harbor Marina Project Closing Status

Dear Mr. Haley:

This letter is to confirm the status of the project funding and insurance for the project
referenced above.

We are pleased to confirm that we have been given bank verification of blocked/reserved
funds which are clean, unencumbered and of non-criminal origin and set aside for your
project in the amount of $105,000,000 USD.

We have also been informed that the final loan documents will be ready and presented on a
timely basis for the anticipated closing scheduled sometime during the 1st week of June.

As a result of these final critical steps being accomplished as part of the closing process we
have submitted all of the above to our insurer for final terms, conditions and commitments to
prepare for policy issuance.

I am very excited to assist our client EVMC Real Estate Consultants, Inc. in the closing of
your transaction.

Sincerely,

Michael D. Reis, ARM
Vice President – Structured Financial Risks

# Exhibit J

# SWIFT MESSAGE TEXT

FROM                :
TO                  :
TRANSACTION CODE    :
REFERENCE CODE      :
TRANSACTION NUMBER :

## LETTER OF CONFIRMATION

WE          THE                        UNDERSIGNED,
.........................................................IRREVOCABLY, UNCONDITIONALLY, AND WITH FULL BANK RESPONSIBILITY CONFIRM THAT: ALL PREVIOUS CORRESPONDENCE BETWEEN CITI
AND          RELATING TO THE TRANSACTION FOR EVMC REAL ESTATE CONSULTANTS, INC. IS CONFIRMED; THE      BILLION FIVE HUNDRED MILLION UNITED STATES DOLLARS ($ ,500,000,000.00USD) IN LAWFUL, GOOD, CLEAN, FUNDS OF NON-CRIMINAL ORIGIN AND BLOCKED IN ACCOUNTS NUMBERED        AND        , IS CONFIRMED; THE JUNE 29th, 2007 BLOCKED FUNDS LETTER IN FAVOR OF      FOR EVMC IS CONFIRMED. FURTHERMORE, WE CONFIRM THE LETTER ISSUED BY, DATED JUNE 6, 2007, AND THE AUTHORIZATION OF
TO EXECUTE ALL PAST AND FUTURE DOCUMENTS REQUIRED TO PERFECT THE TRANSACTION BETWEEN EVMC,      AND CITI
ADDITIONALLY, THE AFORMENTIONED BLOCKED FUNDS LETTER SHALL BE EVIDENCED ON THE SCREEN AND ISSUED WITH FULL CITI
RESPONSIBILITY IN FAVOR OF      FOR THE BENEFIT OF EVMC REAL ESTATE CONSULTANTS, INC, TO OBTAIN A LINE OF CREDIT. FURTHERMORE, WE CONFIRM UPON THE CONFIRMATION OF THIS SWIFT MESSAGE BY      THE TRANSACTION WILL BE ACCEPTED BY THE AND TRANSACTION WILL BE CONCLUDED.

THIS IS AN OPERATIVE INSTRUMENT AND IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDIT (1933) REVISION, INTERNATIONAL CHAMBER OF COMMERCE (ICC) PUBLICATION NO. 500 AND ENGAGES US IN ACCORDANCE WITH THE THERMS THEREOF. NO MAIL CONFIRMATION WILL FOLLOW.

SINCERELY

# Exhibit K

## *EVMC Real Estate Consultants, Inc*

August 7, 2007

Mr. Michael Haley
Sands Harbor Marina LLC
101 Davidson Lane West
West Islip, NY 11795

### RE: Sands Harbor Marina LLC

Dear Mr. Haley:

This is to inform you that EVMC has a reserved blocked funds OPEC facility. All requirements for funding this facility are in place. EVMC is awaiting reconfirmation from OPEC's bank for activation. Once the line of credit is activated, the EVMC master account will be funded with the proceeds of the line of credit. We expect this process to take approximately 10 days.

A portion of this funding, i.e. the sum of $100,022,000, has been earmarked for the Haley project. Once EVMC has received funding to its master account, these funds will be available to finance the Haley project, without restriction.

Upon receipt of funds to the EVMC master account, the closing documents will be released for your review and closing instructions will be issued to the title company. Once the title company has accepted the closing instructions, EVMC will fund the escrow account of the title company, and the title company will be authorized to release the funds upon their compliance with the terms of the closing instructions.

Subject to any review comments or changes from the Haley Group on the closing documents, we estimate closing to take approximately 5 - 7 business days for the title company to process.

We understand that your closing with your Sellers must be completed by Friday, August 31, 2007.

EVMC Real Estate Consultants, Inc.

By: _____
Ester Vargas, Director

Warner Center Business Park, 5850 Canoga Avenue, Suite 400
Woodland Hills, CA.91367
Phone: (818) 710-3822                    Fax (818) 342-2610

# Exhibit L

# THE OPEC FUND
## FOR INTERNATIONAL DEVELOPMENT



29ᵗʰ August, 2007

From: OPEC Trust

Reference: EVMC PROJECT FINANCE OF FUNDS TO ESCROW /
NATIONAL REAL ESTATE INFORMATION SERVICES

EVMC Real Estate Consultants, Inc.
Warner Center Business Park,
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367

Dear Sirs,
Please be advised that the allocated project amount has been approved. Funds will
be available for transfer upon the return of another two officers from holiday.

Project Descriptions
University Tract and Pinecreek Ranch
1248 University, LLC, a Florida LLC
3818 Del Prado Blvd., Cape Coral, FL 33904

Sands Harbor Marina LLC SANDS HARBOR OPERATING LLC
101 Davison Lane West
West Islip NY 11795

Confirmation for the transfer will commence from the week of September 17ᵗʰ on
to the EVMC master escrow account held at National Real Estate Information
Services, 100 Beecham Drive, Pittsburgh, PA 15205

Sincerely,

Nwosu Nicks Darlington Jr. OPEC Trust

# Exhibit M

## *EVMC Real Estate Consultants, Inc*

### INVOICE

January 30, 2008

Mr. Michael Haley
Sands Harbor Marina LLC
101 Davidson Lane West
West Islip, NY 11795

**Project: Sand Harbor Marina, LLC 100,022,000. Request**

| Item | Description | Total |
|------|-------------|-------|
| EF | Earned Fee1% | 1,022,000.00 |
| PMT | Payment Received | (1,022,000.00) |
| BAL | Balance Due | 15,570,000.00 |

Please remit the balance to TISDALE & NICHOLSON, LLP

### WIRING INSTRUCTIONS

Name of Bank: City National Bank
Branch:          Century Plaza Towers
Name of Account: TISDALE & NICHOLSON, LLP, CLIENT TRUST ACCOUNT
Routing Number:
Account Number:

Thank you,

EVMC Real Estate Consultants, Inc

### Due upon Receipt

Warner Center Business Park, 5850 Canoga Avenue, Suite 400
Woodland Hills, CA.91367
Phone: (818) 710-3822                                    Fax (818) 342-2610

# Exhibit N

## ROSEN, McCARTHY, GYEMANT & BABBITS

A Professional Law Corporation

332 Pine Street, Suite 700
San Francisco, CA 94104
Telephone (415) 291-1700
Facsimile (415) 291-1713

PLEASE REPLY TO
SAN FRANCISCO

350 W. Colorado Blvd., Suite 210
Pasadena, California 91105
Telephone (818) 449-7500
Facsimile (818) 585-1416

April 18, 1995

Mr. Guy C. Nicholson
Tisdale and Nicholson
2049 Century Park East, Suite 755
Los Angeles, CA   90067

RE:  BANLAVOURA I., INC v. GYEMANT, et al.

Dear Mr. Nicholson:

As my office advised you last week, our copy of the fee agreement executed by Larry and Aida Esacove is in our storage facility and has not yet been retrieved. Although you obviously have access to the original which was retained by your clients, I enclose the form of the agreement which remains in our computer. These were the terms under which both parties acted.

Please fax to me a file stamped copy of your Complaint for our file. As we previously advised you, Mr. Gyemant has been interviewed by agents of the FBI, U.S. Secret Service and the California Department of Justice, on behalf of Interpol, concerning the activities of the Esacoves and their associates, including Mr. Ruth. We advised these agencies that we were bound by the attorney client privilege concerning the subjects of their inquiry. Since the filing of your Complaint has waived the privilege, I have instructed Mr. Gyemant that he is obligated to advise these authorities that the subjects discussed are no longer privileged. As a courtesy, we will advise you in advance of documents which we propose to deliver to the various agencies.

Very truly yours,

Dennis A. Babbits

DAB:la
Enclosure
cc:  Richard Plotin, Esq.

# Exhibit O

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br>Plaintiff,<br>v.<br>01  LARRY ESACOVE  (03/22/1935), and<br>02  AIDA ESACOVE  (09/02/1938)<br>Defendant(s). | CASE NO. LA047370<br><br>*FELONY COMPLAINT*<br>*FOR ARREST WARRANT* |

The undersigned is informed and believes that:

COUNT 1

On or between December 1, 2000 and November 1, 2004, in the County of Los Angeles, the crime of THEFT FROM ELDER OR DEPENDENT ADULT, in violation of PENAL CODE SECTION 368(d), a Felony, was committed by LARRY ESACOVE and AIDA ESACOVE, who committed theft and embezzlement with respect to the property of an elder and dependent adult, said property having a value exceeding $400.00, and knew and reasonably should have known that said person, VIRGINIA CHRISTIE, was an elder and dependent adult.

* * * * *

COUNT 2

On or between December 1, 2000 and November 1, 2004, in the County of Los Angeles, the crime of GRAND THEFT OF PERSONAL PROPERTY, in violation of PENAL CODE SECTION 487(a), a Felony, was committed by LARRY ESACOVE and AIDA ESACOVE, who did unlawfully take money and personal property of a value exceeding Four Hundred Dollars ($400), to wit money the property of VIRGINIA CHRISTIE.

* * * * *

Rev. 820-6/03 DA Case 24477281                    Page 1                    Case No. LA047370
*FELONY COMPLAINT FOR ARREST WARRANT*

**COUNT 3**

On or between January 1, 2001 and November 1, 2004, in the County of Los Angeles, the crime of GRAND THEFT OF PERSONAL PROPERTY, in violation of PENAL CODE SECTION 487(a), a Felony, was committed by LARRY ESACOVE and AIDA ESACOVE, who did unlawfully take money and personal property of a value exceeding Four Hundred Dollars ($400), to wit money the property of BILLIE DIERKING.

It is further alleged as to count(s) 1, 2 and 3 that in the commission of the above offense(s) the said defendant(s), AIDA ESACOVE and LARRY ESACOVE, with the intent to do so, took, damaged and destroyed property of a value exceeding $150,000, within the meaning of Penal Code Section 12022.6(a)(2).

\* \* \* \* \*

Further, attached hereto and incorporated herein are official reports and documents of a law enforcement agency which the undersigned believes establish probable cause for the arrest of defendant(s) LARRY ESACOVE and AIDA ESACOVE for the above-listed crimes. Wherefore, a warrant of arrest is requested for ~~LARRY ESACOVE and AIDA ESACOVE.~~

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT AND THAT THIS COMPLAINT, CASE NUMBER LA047370, CONSISTS OF 3 COUNT(S).

Executed at LOS ANGELES, County of Los Angeles, on November 4, 2004.

_____
JOANNA K. IP DURIE
DECLARANT AND COMPLAINANT

STEVE COOLEY,  DISTRICT ATTORNEY

BY: _____
JENNIFER O'OWEN
DEPUTY DISTRICT ATTORNEY

| AGENCY: | U.S. DEPT OF TREASURY | I/O: | JOANNA K. IP DURIE | ID NO: | 00000 | PHONE: | (562) 624-3925 |
| DR NO: | 270D-LA-231295-A | OPERATOR: | NRW | PRELIM. TIME EST: | 1 HOUR(S) | | |

| DEFENDANT | CII NO. | DOB | BOOKING NO. | BAIL RECOM'D | CUSTODY RTN DATE |
|---|---|---|---|---|---|
| ESACOVE, LARRY | | 3/22/1935 | | $728,000 | |
| ESACOVE, AIDA | | 9/2/1938 | | $728,000 | |

Rev. 920-9303 DA Case 24477281          Page 3          Case No. LA047
FELONY COMPLAINT FOR ARREST WARRANT

It appearing to the Court that probable cause exists for the issuance of a warrant of arrest for the above-named defendant(s), this warrant is so ordered.

LARRY ESACOVE _____   BAIL: $ _____

AIDA ESACOVE   BAIL: $ _____


DATE: _____

Judge of the Above Entitled Court

Rev. 820-6/03 DA Case 24477301     Page 4     Case No. LA047370

*FELONY COMPLAINT FOR ARREST WARRANT*

NON-WARRANT DEFENDANTS:

| DEFENDANT | CII NO. | DOB | BOOKING NO. | BAIL RECOM'D | CUSTODY RTN DATE |
|-----------|---------|-----|-------------|--------------|------------------|
|           |         |     |             |              |                  |

Rev. 820-853 DA Case 24477281          Page 5          Case No. LA047370
*FELONY COMPLAINT FOR ARREST WARRANT*

**FELONY COMPLAINT -- ORDER HOLDING TO ANSWER -- P.C. SECTION 872**

It appearing to me from the evidence presented that the following offense(s) has/have been committed and that there is sufficient cause to believe that the following defendant(s) guilty thereof, to wit:

*(Strike out or add as applicable)*

**LARRY ESACOVE**

| Count No. | Charge | Charge Range | Special Alteration | Alteg. Effect |
|-----------|--------|-------------|--------------------|---------------|
| 1 | PC 368(d) | 2-3-4 | PC 12022.6(a)(X) | +2 Yrs |
| 2 | PC 487(a) | 16-2-3 | PC 12022.6(a)(X) | +2 Yrs |
| 3 | PC 487(a) | 16-2-3 | PC 12022.6(a)(X) | +2 Yrs |

**AIDA ESACOVE**

| Count No. | Charge | Charge Range | Special Alteration | Alteg. Effect |
|-----------|--------|-------------|--------------------|---------------|
| 1 | PC 368(d) | 2-3-4 | PC 12022.6(a)(X) | +2 Yrs |
| 2 | PC 487(a) | 16-3-3 | PC 12022.6(a)(X) | +2 Yrs |
| 3 | PC 487(a) | 16-2-3 | PC 12022.6(a)(X) | +2 Yrs |

I order that the defendant(s) be held to answer therefore and be admitted to bail in the sum of:

LARRY ESACOVE _____ Dollars

AIDA ESACOVE _____ Dollars

and be committed to the custody of the Sheriff of Los Angeles County until such bail is given. Date of arraignment in Superior Court will be:

LARRY ESACOVE _____ in Dept _____

AIDA ESACOVE _____ in Dept _____

at: _____ A.M.

Date: _____        _____
                                        *Committing Magistrate*

Rev. 920-5/03 DA Case 84477281          Page 6          Case No. LA047370

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CV-09 3855**

## I. (a) PLAINTIFFS
The Sands Harbor Marina Corp., Sands Harbor Marina LLC, The Sands Harbor Marina Operating Corp., Sands Harbor Operating

**DEFENDANTS**
Wells Fargo Insurance Services of Oregon, Inc.

**(b)** County of Residence of First Listed Plaintiff   Suffolk
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) 631 777 1313
Roy A. Klein
532 Broadhollow Road, Suite 144 Melville NY 11747

Attorneys (If Known)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 0 2009 ★

SEYBERT, J.
WALL, M.J.

LONG ISLAND OFFICE

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. 51332
Brief description of cause: Business Fraud

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 6,472,000.00
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## ARBITRATION CERTIFICATION

I, Roy A. Klein_____, counsel for Plaintiff_____ _____do hereby
certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages
recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs.
_____ Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

_____

**Please refer to NY-E Division of Business Rule 50.1(d)(2)**

1.) Is the civil action being filed in the Eastern District of New York removed from a New York State court located
in Nassau or Suffolk County: No_____

2.) If you answered "no" above:

    a.) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau
or Suffolk County? Yes_____

    b.) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the
Eastern District? Yes_____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than
one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the
claimants, if there is more than one) reside in Nassau or Suffolk County? _____

    (Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

**I am currently admitted in the Eastern District of New York and currently a member in good standing of the
bar of this court.**

Yes____✓____                           No_____

**Are you currently the subject of any disciplinary action(s) in this or any other state or federal court?**

Yes_____(If yes, please explain)         No____✓____

Please provide your E-MAIL Address and bar code below. Your bar code consists of the initials of your first and last
name and the last four digits of your social security number or any other four digit number registered by the attorney
with the Clerk of Court.
(This information must be provided pursuant to local rule 11.1(b) of the civil rules).

**ATTORNEY BAR CODE:** RAK-9850_____

**E-MAIL Address:** RKlein@loorak.com_____

I consent to the use of electronic filing procedures adopted by the Court in Administrative Order No. 97-12, "In re
Electronic Filing Procedures(EFP)", and consent to the electronic service of all papers.

**Signature:** _____