UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE SANDS HARBOR MARINA CORP., SANDS HARBOR MARINA LLC, THE SANDS HARBOR MARINA OPERATING CORP., SANDS HARBOR MARINA OPERATING LLC, GREG W. EAGLE, PINE CREEK RANCH, LLC, And UNIVERSITY 1248, LLC<br><br>        Plaintiffs<br><br>  v.<br><br>WELLS FARGO INSURANCE SERVICES OF OREGON, INC., WELLS FARGO BANK, N.A., EVMC REAL ESTATE CONSULTANTS, INC., LARRY ESACOVE, THE ESTATE OF AIDA ESACOVE, DAVID P. GUILOT, ANTHONY B. CHOPRA, TISDALE & NICHOLSON, LLP, JEFFREY A. TISDALE, GUY C. NICHOLSON and MICHAEL D. REIS,<br><br>        Defendants<br>_____/ | Index No.: 09 CV 3855 |

**DECLARATION OF ANDY DOGALI IN SUPPORT OF
DOGALI LAW GROUP, P.A.'S MOTION FOR AWARD
OF EXPENSES PURSUANT TO RULE 45**

**STATE OF FLORIDA
COUNTY OF HILLSBOROUGH**

Anthony Anderson Benton Dogali, being duly sworn, deposes and says:

    1.    I am over the age of 18 years and of sound mind.  I understand the obligations of an oath.  I am competent to attest to all matters set forth in this Declaration.  I have personal knowledge of the matters contained in this Declaration.

    2.    I am President and sole shareholder of the law firm of Dogali Law Group, P.A.  I co-founded the firm on December 27, 1999 under the original name of Forizs & Dogali, P.A.  I

1

became sole shareholder and owner of the firm during October of 2013, at which time the firm was renamed Dogali Law Group, P.A.  At all times since formation of the firm in 1999, I have been its managing shareholder.

3.    I have been a practicing attorney since 1986.  I am a member in good standing of the Florida Bar, all three United States District Courts in Florida, and the United States Circuit Court of Appeals, Eleventh Circuit.  I have appeared in additional federal circuit courts, and I have appeared *pro hac vice* in federal district courts in at least a dozen states outside of Florida, including the United States District Court for the Eastern District of New York.

4.    I practice commercial litigation in a number of fields.  Further information about my experience and qualifications is available at http://dogalilaw.com/andy-dogali.html.

5.    I offer this Declaration in support of Dogali Law Group's Motion for Award of Expenses Pursuant to Rule 45.

## I.    THE EVMC REPRESENTATION

6.    From late 2007 through mid-2009, Dogali Law Group (then known as Forizs & Dogali, P.A.) was counsel to Defendant EVMC, and performed services in relation to eight separate files or matters, seven of which were distinct disputes or transactions, and one of which was a "general matters" file. This firm typically uses general matters files to encompass miscellaneous activities which are small in scope and which are unrelated to other specific matters, and to encompass activities relating simultaneously to multiple specific matters.

7.    My direct involvement in the EVMC representation was very limited, encompassing only consultation and research regarding certain specific areas of law for a total of about one percent of the firm's total time commitment (8.7 of about 850 total hours).  Other attorneys who were then employed by the firm directly handled the representation.  Except for

the limited consultation and research described above, I was generally aware of the EVMC representation to the extent the attorneys principally handling the matters routinely conferred with me regarding the client relationship, the firm's commitments to or for the client, and the client's payments to the firm for services rendered and costs incurred.

8.  On July 22, 2010, Defendant Wells Fargo served a subpoena upon my firm generally seeking production of documents relating to one of the firm's EVMC matters – matter which was specific to Sands Harbor. Exh. 1. At that time, it appeared that EVMC was a non-party, and no party asserted that EVMC was inactive or incapable of asserting any legally cognizable privileges. On July 27, 2010, the firm timely raised a number of objections to the subpoena. Exh. 2. Thereafter, the firm communicated with counsel for Wells Fargo, assembled and produced documents responsive to the subpoena, and created a privilege log of withheld items. Exh. 3 and 4.

9.  In September of 2010, the firm submitted to Wells Fargo, pursuant to Rule 45 of the Federal Rules of Civil Procedure, an invoice reflecting the time and expense the firm had incurred in complying with the subpoena. At Wells Fargo's request, the invoice was revised to show Wells Fargo as its addressee rather than EVMC. Exh. 5-7. Though Wells Fargo received the documents in compliance with the subpoena, Wells Fargo paid no portion of the invoice. Dogali Law Group then heard nothing about the matter until 2016.

10. During April of 2016, I was contacted by counsel for Defendant Tisdale & Nicholson. Those communications related generally to the 2010 activities and the current status of EVMC. Apparently, EVMC had been joined into the lawsuit sometime during the prior six years. Also during that time, EVMC had become dissolved. I was advised that Wells Fargo and

3

perhaps other parties might contact the firm to seek reconsideration of the firm's 2010 privilege log.

11. I received that communication on July 5, 2016, when I was first contacted by counsel for Defendant Wells Fargo regarding the 2010 subpoena. I was asked whether my firm still possessed documents which were withheld during 2010, which I confirmed, the same day. Exh. 8, 0009. As my communications with Wells Fargo's attorney continued through July of 2016, I was advised that Wells Fargo had filed a motion to compel with this Court, seeking to overrule the privilege-based objections which a similarly-situated law firm, Defendant Tisdale & Nicholson, had asserted in connection with its EVMC-related files. In response to Wells Fargo's initial outreach, I diligently:

- Attempted to contact the principals of the former client;

- Reviewed the motion practice materials provided by Wells Fargo's counsel;

- Communicated with the attorneys who principally handled the EVMC representation for my firm during the period from 2007 through 2009;

- Reviewed this Court's docket for the case, in an effort to understand the nature of the dispute and comply with what I was told would be the Court's and parties expectations; and

- Constantly and cooperatively communicated with Wells Fargo's counsel about such efforts. See, for example, Exh. 8, 0003-0009.

12. On July 29, 2016 I advised Wells Fargo's counsel that I had been instructed by a former principal of EVMC to assert all available objections and privileges in relation to the subpoena. On August 1 Wells Fargo acknowledged this position and noted that it was

unfortunate that motion practice could not be avoided. Exh. 8, 0005-0006.  After August 15, 2016, my communications with Wells Fargo's counsel essentially abated.

13. On December 6, 2016, counsel for Wells Fargo re-established contact and advised me that this Court had granted Wells Fargo's motion to compel and had overruled Tisdale & Nicholson's assertions of privilege. Wells Fargo asked me to reconsider the objections and assertions of privilege which had been raised in 2010. Exh. 8, 0002-0003.

14. The situation which then existed presented an unusual and difficult position for Dogali Law Group, in so far as the firm had been instructed by a representative of its former client to assert or preserve any privileges or confidentiality protections which might exist.  The unusual situation required research and analysis of issues which would not typically be faced by recipients of a Rule 45 subpoena, including:

- Whether a dissolved or otherwise defunct corporation has standing to assert evidentiary privileges;

- Whether the former principals of a dissolved or otherwise defunct corporation have standing to assert the evidentiary privileges of their former entity, on the entity's behalf or individually;

- Whether these issues, as they relate to protection of Dogali Law Group's files, are governed by the laws of New York (the location of the case), Florida (the location of the files and the prior activities at issue), and/or California (the domicile of the former client);

- Whether the attorneys associated with Dogali Law Group have standing to assert work product protections, on their own behalf, even where a former client cannot do so.

5

15. After consideration of these issues and further communications with former principals of EVMC, I advised Wells Fargo's counsel on December 28, 2016 that, regrettably, I was not at liberty to voluntarily release the materials. Exh. 8, 0002. After Wells Fargo responded by indicating counsel's intention to discuss the matter with this Court, I provided copies of what I believed is a collection of the parties' pertinent 2010 communications about the 2010 objections, asked whether other communications had occurred, and suggested that the proper procedure under Rule 45 would be for Wells Fargo to obtain a ruling on the 2010 objections. Exh. 8, 0001-0002. Wells Fargo's counsel advised that he would also try to determine whether further communications ever occurred, and requested a copy of the privilege log which was served in 2010.

16. On January 5, 2017, Wells Fargo's counsel provided to me a letter outlining Wells Fargo's arguments and authorities in support of my reconsideration of the 2010 objections. Exh. 9. The next day I advised Wells Fargo that: 1) I was indeed reconsidering the 2010 objections; 2) I would like to know whether any communications ever occurred regarding the 2010 objections; and 3) I expected Dogali Law Group to be reimbursed for its burden of complying with the 2010 objections. Exh. 10, 0001. Also after receipt of the January 5 position letter, I forwarded copies of the letter to former principals of EVMC along with my own thoughts about whether the arguments raised in the letter could be conscientiously opposed.

17. On January 9, 2017, I provided a copy of the requested privilege log. Exh. 11. Wells Fargo's counsel responded by asking whether, if the 2010 objections should be rescinded, I would be in a position to immediately produce the withheld items. Counsel also asked whether other documents exist which might be available for production, in addition to those on the privilege log. I advised that little additional effort would be needed if the only required action

6

were production of the items withheld in 2010. I noted that if the production should be broadened, a new subpoena would be necessary. Exh. 11, 12.

18. On January 10, 2017, I advised Wells Fargo's counsel that I expected to need a few more days for the former clients to provide me with their own position regarding my firm's records, and reconsideration of the 2010 objections. Exh. 12. Wells Fargo's counsel requested a copy of the 2010 subpoena, and asked for a description of any additional records my firm might possess, so that Wells Fargo could evaluate whether the records would justify the likely burden of retrieving and producing them. In response, I provided the requested copy of the 2010 subpoena, informed counsel that my firm possessed seven files relating to EVMC which were not encompassed by the 2010 subpoena, and reiterated that a new subpoena was necessary to support production of further records. I advised that I did not know how voluminous the other files might be, but that my firm had invested about 20 hours of attorney time and 10 hours of paralegal time in 2010 to produce the single responsive file, and an investment of at least a similar amount of time seemed inevitable. Exh. 13, 0007-0008.

19. Counsel for Wells Fargo requested further descriptive information about the additional files, and asked for my firm's hourly rates. On January 11, 2017, I provided precise and detailed answers to Wells Fargo's questions by interlineation. I also noted that my law firm had represented two of the EVMC principals in their individual capacities, so a privilege review would be needed for those documents in any event. Exh. 13, 0005-0007 (boldface italicized text). Wells Fargo responded to each item on January 12, 2017, also by interlineation, by stating it wanted to obtain each of the additional files and expected to issue a "revised subpoena" for this purpose. Exh. 13, 0005-0007 (prefix LR1-12).

7

20. After communicating further with the EVMC principals and performing research on several implicated issues, I responded following the "few days" I had advised Wells Fargo to expect, with a communication of Saturday, January 14, 2017. I explained that I was prepared to withdraw the 2010 attorney-client privilege objections, but would preserve the 2010 attorney work product objections. I also noted my discomfort with affirmatively withdrawing the duly-served 2010 objections, which were viable and appropriate when they were served. I suggested an alternate approach would be to issue a new subpoena encompassing the 2010 materials and the additional seven files. I could then address the subpoena anew. I would not be required to withdraw the 2010 objections which had been duly asserted, but would simply address the new subpoena and would not repeat those objections. I offered to accept email service of the new subpoena upon issuance. I described the review I thought would be needed, on a file-by-file basis. I estimated the amount of time I had already invested in complying with Wells Fargo's subpoena, and estimated how much more time was anticipated. I sought Wells Fargo's agreement to reimburse my firm for the burden which would result from compliance, and proposed that:

- Wells Fargo should agree to pay the 2010 invoice, which Wells Fargo had never paid even though it received the non-privileged documents pursuant to the subpoena ($3,958.83);

- Wells Fargo should agree to absorb the cost of my reasonable time to be incurred, which I estimated at about 10 hours of my time and about 20 hours of my paralegal's time (est. $6,000);

- I would agree, for purposes of the proposal, to absorb an estimated 12 hours of time I had already spent on research, communications, and other efforts. Exh. 13, 0002-0004

21. On January 18, 2017, Wells Fargo's counsel responded, by interlineation, agreeing with most points raised. Wells Fargo made no authorized proposal to reimburse my firm for its anticipated burden. Rather, ignoring the 2010 subpoena and invoice, Wells Fargo's counsel made a conceptual, unauthorized reference to recommending to his client that Wells Fargo might agree to a "$1,250 payment for your work done to comply with our newly amended subpoena." Exh. 13, 0002-0004 (boldface all-capitals font). No newly amended subpoena yet existed.

22. On January 22, 2017, I advised Wells Fargo's counsel that if the subpoena were issued immediately, I thought I could comply in about one week. I requested confirmation that no party to the case would object to the subpoena, to avoiding prematurely starting the review and compilation effort. Exh. 13, 0001.

23. On January 23, 2017, I received the newly issued amended subpoena. With transmittal of the subpoena, Wells Fargo's counsel indicated that no objections to issuance of the non-party subpoena were expected, so I should start the prompt review and compilation, and he noted that he looked forward to continuing to communicate with me in an effort to agree upon an appropriate cost for reimbursement. Exh. 14. That day, I provided counsel with citations to authorities which establish that attorney time is compensable under Rule 45(d)(1), and reiterated my view that no party could reasonably object to the time burden which I had projected. Exh. 15, 0013-0014. At this point I understood that I was required to comply with the subpoena on or before its return date of February 14, 2017, that I would request reimbursement pursuant to Rule 45, and that we simply had no agreement as to what a reasonable cost for reimbursement would be.

24. On January 30, 2017, counsel responded by stating Wells Fargo's position that the amount of Rule 45 burden costs which might be awarded would be a subject for the reviewing Court's discretion, a notion with which I did not disagree. My estimated impact of $6,400, which Wells Fargo characterized as a sum I had expressly demanded rather than one I had simply estimated, was said to be unreasonable. Counsel stated that the attorneys planned to discuss the issue with this Court on February 1, 2017, and invited me to participate in that call. Exh. 15, 0012-0013.

25. I declined the invitation to appear before the Court, as nothing had shaken my view that the appropriate Court to take up my firm's Rule 45 objections and burden would be the Middle District of Florida, and because compliance with the subpoena was not due for at least another two weeks. I saw no basis for a voluntary appearance before this Court. Exh. 15, 0011. Counsel indicated that on February 2, 2017 he would update me on any developments which arose during the February 1 telephone conference with the Court. Exh. 15, 0011.

26. On February 6, 2017, counsel advised that this Court was prepared to issue an order requiring my firm to produce the items withheld in 2010 on the basis of attorney-client privilege. Exh. 15, 0009-0010. I did not really understand this position, because I had already agreed that no objection would be raised as to those documents, and their production was not yet due under the only subpoena requiring their production.

27. On February 13, 2017, I advised counsel that I was nearing completion of the review and compilation but that I would not be finished by the next day, and I requested his indulgence in a few extra days until the end of that week. I gave a detailed description of what the parties should expect from the production. As for the 55 documents listed in 2010 as privileged, I told counsel I would not be invoking the attorney-client privilege, or any other

10

protection, for 45 of them. As to the other 10 documents, I advised counsel to expect other protections to be asserted, and specifically referred to the attorney work-product doctrine and the mediation privilege. Exh. 15, 0008-0009.  Wells Fargo responded by indicating its intention to pick up the copies when I had prepared them. Exh. 15, 0008.

28.     On February 17, 2017, I advised counsel that my paralegal had been out for three days due to illness, and I could not meet my stated goal of completing the effort by that day. I stated that I saw no reason I could not complete the effort by the end of the following week (February 24, 2017). Exh. 15, 0007.

29.     Wells Fargo responded by stating its unilateral expectation that the materials would be available for pickup sooner than the extension I had requested, even though I had never agreed to produce them in advance of a promise that my firm's burden would be offset.  As for an agreement regarding an appropriate value to offset my firm's burden of compliance, counsel stated only that "[w]e will cross that bridge when we come to it." Exh. 15, 0006.

30.     On February 23, 2017, I let counsel know we had come to the bridge. On that date I served Dogali Law Group's objections and responses to the new subpoena. Exh. 16, 17.  The objections and responses are concise and limited.  They include:

> The responsive materials will be made available upon reaching an agreement regarding the responsibility of the party serving the subpoena for the burden and expense incurred by Dogali Law Group in complying with the subpoena, pursuant to Rule 45(d)(1). Absent such an agreement, Dogali Law Group will file a petition with the United States District Court for the Middle District of Florida for adjudication of such responsibility.

Exh. 17 p. 1-2.

31.     Simultaneously with service of the responses and objections, I provided to counsel for Wells Fargo: 1) a detailed description of all the efforts which had been necessary to comply with the subpoena; 2) a detailed breakdown of the time and cost associated with each of

11

the described activities; 3) a proposal to compromise the aggregate sum associated with the burden of compliance; 4) a detailed listing of the volume of records to be produced; and 5) a copy of the privilege log, which included updated entries for the single matter which had been encompassed by the 2010 privilege log. Exh. 15, 0003-0005.

32. My February 23, 2017 communication showed that I had underestimated the work necessary to comply with the subpoena. I had projected about 10 hours of work for myself after January 10, 2017; the actual amount was about 25 hours. I had projected about 20 hours of work for my paralegal after January 10, 2017; the actual amount was 28 hours. I noted that the total cost of my firm's burden through the date of the objection was $14,700 for the 2016-2017 activities, in addition to the 2010 burden which Wells Fargo had always ignored, for a total of about $18,650. I proposed to reduce the 2016-2017 effort by more than 40%, to $8,750. Along with the 2010 invoice, this created a total proposal of $12,708.83. Exh. 15, 0003-0005.

33. On February 27, 2017 counsel for Wells Fargo repeated his eagerness about "resolving this with [me] amicably," and advised that all parties were considering my February 23, 2017 proposal. Exh. 15, 0002-0003. On March 3, 2017, counsel for Wells Fargo explained that a week of silence had passed due to illness. He said the parties were still considering my February 23, 2017 proposal, and he requested further information in order to do so. Exh. 15, 0002. I provided the requested information the same day, by interlineation. Exh. 15, 0002 (boldface italicized font).

34. On March 6, 2017, counsel for Wells Fargo advised that my proposal of $12,700 was unreasonable, and acknowledged that I might now be in a position to make an application for this amount. He advised that the parties to the lawsuit had "collectively" agreed to pay $4,500 toward my firm's Rule 45 burden. Exh. 15, 0002. I did not know, and do not now know,

why the participation of other parties in the "collective" offer should matter to me, as only Wells Fargo served a subpoena on my firm which requires compliance. If the other parties had agreed to defray some of Wells Fargo's costs, that is their prerogative, and only serves to reduce the burden on Wells Fargo of compelling my compliance with a subpoena.

35. On March 15, 2017, counsel requested an update and response from me. Exh. 15, 0001. Before I responded I received, at 4:00 p.m. on Friday, March 17, 2017, a letter from an attorney for Wells Fargo with whom I had not communicated. Exh. 18 [Doc. 281]. In many respects, the letter did not accurately reflect the course of communications which had occurred between counsel for Wells Fargo and me.

36. At the time the letter arrived, I was out of town, visiting my father, for whom I am legal guardian, and meeting with officials about his care. I returned to town on March 22, 2017. That evening, counsel for Wells Fargo advised as follows: "*we've spoken to the clerk since we e-filed, and she informed that the Court is waiting to rule on this to give you an opportunity to respond to it. If you intend to do so, let me know and I will inform the Court.*" Exh. 19, 0003. I took counsel at his word. Also, I did not understand that a particular deadline existed for responding to the letter.[1]

37. The next day, Thursday, March 23, 2017, I forwarded a communication to Wells Fargo's counsel which outlined particular issues and concerns I had about the position taken in the letter-motion and about my appearance before the Court as a non-party. Moreover, the

---

[1] While I have seen in some districts that counsel occasionally submit matters to the Court by letter, the practice is quite foreign to my most frequent practice, in that letters to the Court are prohibited in all three Florida District Courts. (See Local Rule 3.01(f), Middle District of Florida; Local Rule 7.1(M), Northern District of Florida; Local Rule 7.7, Southern District of Florida.) I have not previously observed the practice of requesting affirmative relief, as would ordinarily be sought by motion, by letter. Nor have I observed the practice of requiring a _non-party_ to respond to a letter-motion. This note is not offered to justify a non-response to the Court, only to provide some context for my failure to appreciate that any particular deadline existed, if one did.

13

proposal *clearly and absolutely stated that I intended to file an opposition to the letter-motion, and even provided the timetable by which I intended to do so ("I hope and expect to be able to substantively respond after this weekend")*. Exh. 19, 0002.  Apparently, counsel did not inform the Court as he had assured me he would.

38. In addition, in my March 23, 2017 communication I offered to accept $8,400.00 in resolution of all the Rule 45 costs, for the 2010 and the 2016-2017 effort.  This amount included the 2010 invoice along with a *70% reduction* in the 2016-2017 commitment. Wells Fargo remained mute, and motion practice ensued.

39. On March 29, 2017, counsel for Wells Fargo provided me with a copy of this Court's Order, which deemed Wells Fargo's letter to be an unopposed motion.  Apparently no party advised the Court of their actual knowledge that the motion was in fact *opposed*, and that a substantive response would be forthcoming.

40. At all times, I communicated openly, cooperatively, and cordially, with counsel for Wells Fargo.  In fact, I suspect the level of cooperation and interaction which Wells Fargo received from me is fairly unprecedented in the context of Rule 45 non-party subpoena compliance.

41. At no time did I, nor would I, convey anything resembling disrespect for this Court or its Orders, or for the subpoenas which were issued and served upon my firm.

42. In my view, Wells Fargo encouraged me to assemble responsive materials without agreeing to pay a reasonable sum to offset my firm's burden of compliance. Wells Fargo's penchant for doing so is already established by the fact that Wells Fargo has ignored the initial invoice for more than six years, *notwithstanding its prompt receipt of the responsive documents*, I acted reasonably at all times, and in full compliance with Rule 45, in taking steps to protect

14

against Wells Fargo doing the same thing again.

43.  I have outlined above many actions necessarily undertaken to comply with the subpoenas, including:

- Investigated the current status of EVMC;
- Investigated the current whereabouts of the principals of the former client;
- Performed research and analysis regarding:
  - The standing of EVMC to assert evidentiary objections and privileges;
  - The standing of EVMC's principals to assert evidentiary objections and privileges;
  - The standing of my law firm and its attorneys to assert evidentiary objections and privileges;
  - The choice of law issues relating to the assertion of evidentiary objections and privileges;
  - Recovery of expenses for burden of compliance under Rule 45 under these circumstances.
- Communicated with the former principals to ensure they had an opportunity to be heard about the issues raised;
- Communicated with the former principals to advise them of my determination that certain evidentiary privileges could no longer conscientiously be asserted;
- Identified and retrieved records from storage;
- Advised counsel for Wells Fargo of my determination to waive certain privileges, but not to waive attorney work product protection;
- Reviewed documents for protection and/or privilege;
- Sorted and assembled the documents for review and/or production;

- Redacted the documents which were subject to privilege;

- Directed and supervised my assistant's creation of copies of the documents and emails to be produced;

- Analyzed documents withheld pursuant to 2010 privilege log to determine whether assertion of privilege could or should continue;

- Created a new privilege log, and revised the 2010 privilege log;

- Reviewed the newly issued, broadened-scope subpoena;

- Drafted objections and responses to the subpoena for service;

- Assembled data regarding the burden and expense incurred by Dogali Law Group in complying with the subpoena, and submitted the same to Wells Fargo's counsel for consideration pursuant to Rule 45(d)(1).

44.     Attached as Exhibit 21 is a printout of time incurred by my firm for the compliance effort during 2016 and 2017, reflecting actual time through the day of this declaration. Attached as Exhibit 22 is a table breaking the hours worked down into discrete periods of time. Exhibit 22 also reflects most of the acknowledgements or reductions I voluntarily proposed to Wells Fargo on February 23, 2017. See Exh. 15, 0004-0005. Though those reductions were offered for the purpose of trying to amicably resolve the claim for costs, I do not recede from most of them here. Several are adjusted to reflect the additional level of precision I have attempted to create for the Court. Also, the breakdown previously provided to Wells Fargo inadvertently omitted about eight hours of time during January of 2017, and rounded each increment to the nearest half-hour. The omitted time is included in Exhibit 22, and precise figures extracted from the timesheets are shown rather than rounded ones, reflecting the firm's customary practice of keeping time to nearest tenth of an hour. Finally, in comparison to

16

the proposal given to Wells Fargo on February 23, 2017, Exhibit 22 includes time worked after that date.

45.  The timekeepers shown in Exhibit 22, and the experience of each, are as follows:

| Timekeeper | | Title | Experience at |
| --- | --- | --- | --- |
| **Name** | **Initials** | | **Time of Services** |
| Lee Atkinson | LWA | Partner | 37 years |
| Andy Dogali | AABD | Partner | 30 years |
| Kathy Gilman | KRG | Paralegal | 17 years |
| Julianne Michael | JEM | Paralegal | 2 years |

46.  Exhibit 22 shows that the time commitment for this matter increased dramatically when the effort to obtain Wells Fargo's agreement to pay a reasonable sum ended. At that point, it became necessary to call the matter to this Court's attention, including through the instant motion practice. Wells Fargo never offered more than the 2010 invoice plus $500, even though the 2010 subpoena encompassed one matter and the 2016 subpoena encompassed eight.

47.  To perhaps assist the Court in differentiating between the purposes for which DLG incurred time in this effort, I have assembled Exhibit 23 to this declaration. To create Exhibit 23, I reviewed the services and time incurred over the last year and I attempted to break the time entries down by issue, unlike Exhibit 22, which simply shows the time broken down into chronological groupings. Generally, by compiling Exhibit 23 I have been able to provide the following estimates of time by issue:

| Issue | Estimated Allocation |
|---|---|
| Communications<br>• General<br>• With former clients<br>• With former employees<br>• With counsel, re 2010 production<br>• With counsel, re 2017 production | $5,950.00 |
| Legal research<br>• Re privilege, work product issues<br>• Re Rule 45 compliance<br>• Re Rule 45 cost recovery | $5,075.00 |
| Review and produce documents, prepare privilege log<br>• 2010 subpoena/production<br>• 2017 subpoena/production | $10,710.00 |
| Motion to Reconsider | $8,050.00 |
| Motion for Rule 45 Costs | $6,300.00 |
| 2010 invoice | $3,624.00 |

48.     Exhibits 21, 22 and 23 include hourly rates which are prevailing and reasonable in the Tampa Bay legal community, which is the locality where the services were performed and where compliance with the subpoena was required. These rates, and even higher rates, have been approved upon my applications to federal and state courts in Florida. The attorney rate of $350/hour is the same rate which the client paid to my firm nearly ten years ago, for my services rendered in 2007-2009. (EVMC paid rates of $400/hour for Mr. Atkinson, and $350/hour for me.) The paralegal rate is actually lower than the client paid my firm for services rendered nearly ten years ago. (EVMC paid $140/hour for paralegals.) I do not know of any objection Wells Fargo might offer to these hourly rates.

49.     Attached as Exhibit 24 is a copy of an order entered early this year by the Honorable James D. Whittemore, United States District Judge, in the case of *Santarlas v. Steube*,

18

case no. 8:15-cv-1311-T-27AAS. Judge Whittemore granted a motion for attorneys' fees seeking $400.00 per hour for my time, finding that "the hourly rates of Plaintiffs' counsel are reasonable and consistent with the market rate for attorneys with similar experience in the community".

50. Exhibit 5 includes an itemization of costs incurred during 2010, which total $334.83. Exhibit 25 is an itemization of costs incurred during 2016 and 2017, which total $431.08. All of these sums were reasonably and necessarily incurred.

51. The time worked on this matter, while necessary, was higher than I expected. Some of this may be due to the fact that during the six years following the initial subpoena, many changes to the makeup of my law firm occurred. Some resulting inefficiencies existed in relation to my retrieval of stored records, communication with former attorneys, and communication with former clients, which might not have been necessary for other firms which had not experienced such changes. While I was never certain that Wells Fargo should be relieved of these inefficiencies which resulted from its six-year inattention to my firm's duly-asserted objections, I had no problem with offering to absorb a large reduction in the total investment of time. I took this approach in the spirit of cooperation and compliance. The first proposal I made, for $12,708.83, was about half of the total commitment at that time. I later provided a proposal which was even lower. Wells Fargo did nothing, necessitating motion practice. The time commitment into this matter increased dramatically since that time, due to the motion practice.

I declare under penalty of perjury under the laws of the United States, the State of Florida, and the State of New York, that the facts set forth above are true and accurate.

Executed on July 17, 2017.

_____
Andy Dogali